# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRIAN K. MILWARD and LINDA J. MILWARD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Civil Action No. 1:07-cv-11944** |
| - vs - | ) | |
| | ) | |
| ACUITY SPECIALTY PRODUCTS GROUP, INC., *et al.*, | ) | **Leave to File Granted on March 9, 2009** |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THE ADMISSIBILITY OF THEIR EXPERT EVIDENCE ON GENERAL CAUSATION

## I.      INTRODUCTION

The narrow issue now before the Court is whether the "general causation" opinion of Plaintiffs' expert Dr. Martyn Smith, that benzene exposure is capable of causing Acute Promyelocytic Leukemia ("APL," the disease suffered by Plaintiff Brian Milward), is sufficiently reliable to be admitted under Fed. R. Evid. 702 and *Daubert*.  Dr. Smith is one of the world's leading researchers in the area of benzene toxicology, and the evidence will unequivocally show that he reached his opinion that benzene is capable of causing APL entirely in the context of his independent scientific research, wholly apart from any legal testimony.  This opinion is consistent with the consensus view of scientists and governmental agencies alike, which universally accept that benzene exposure can cause Acute Myeloid Leukemia ("AML"), of which APL is a sub-type.  Moreover, the evidence will show that, in reaching his opinion at issue here, Dr. Smith employed the standard methodological approach employed by scientists investigating causation, and that there is a substantial body of scientific evidence to support Dr.

Smith's conclusion.  Finally, the evidence will also show that most, if not all, of the disagreements between Dr. Smith and Defendants' experts on this issue fall into the category of *judgment*-driven conclusions, about which scientists routinely disagree.

While assessing the issue of the admissibility of Plaintiffs' expert testimony on general causation in this case, this Court should keep in mind a paraphrased version of a timeworn aphorism: don't lose sight of the forest while examining the bark, roots, branches, and leaves of a handful of the trees.  For purposes of the issue now before the Court, two fundamental tenets – one legal, and the other scientific – provide the shape and characteristics of the "forest" that should be at the forefront of this Court's deliberations.

First, the legal half of the "forest": this Court may not step outside its limited judicial role as a "gatekeeper" of evidence to instead become a factfinder, by resolving issues of credibility raised by conflicting conclusions of competing experts, when those conflicts arise from the legitimate exercise of scientific judgment.

Second, the scientific half of the "forest": this Court must keep in mind the role and application of scientific *judgment* used by experts who analyze general causation issues. When scientists address the issue of whether exposure to a particular chemical is capable of causing a particular disease, they exercise a "weight of the evidence" approach.  Such an approach consists of review and evaluation of the entire body of available scientific evidence bearing on the issue of causation, including consideration of not only epidemiological studies that have examined statistical relationships between exposure and disease, but also consideration of a variety of other types of evidence relating (in part) to biological mechanisms that may lead to disease. Throughout this "weight of the evidence" review, there are multiple steps of the process that can

and do require experts to exercise scientific judgment, without the guidance of any formulaic algorithm directing them to some objectively "correct" conclusion.

Scientists applying the "weight of the evidence" approach must assign relative weight to different types of evidence (that is, what is the importance of epidemiology vs. animal studies vs. cytogenetic studies, etc.) and to individual studies within a particular line of evidence. Each time a scientist assesses the relative weight of one piece of evidence versus another, the expert must exercise judgment, for which science provides no formulaic guidance. Contrary to what some courts may have suggested, scientists do not and cannot resolve general causation issues simply by taking data and plugging them into some mathematical formula that will generate a single "correct" answer. Such a concept is wholly at odds with the reasoning process by which scientists evaluate causation. Rather, the standard, consensus methodology used by scientists in reaching conclusions regarding "general causation" issues predictably and routinely results in scientists reaching disparate conclusions, in spite of the fact that they have all employed the same, appropriate, scientific, "weight of the evidence" approach in analyzing the issue.

Throughout this proceeding, Defendants will seek to divert this Court's attention from the "forest" of overall evidence relevant to the issue of whether benzene is capable of causing APL, and ask this Court to focus instead on individual trees scattered throughout that forest. Put more plainly, Defendants and their experts will argue (at length) to this Court that Dr. Smith has inappropriately interpreted certain specific, individual studies, and that Dr. Smith's allegedly inappropriate interpretations of those specific studies render his conclusions about the overall body of evidence scientifically invalid. Because such arguments regarding individual studies fail to address the forest of overall evidence considered by Dr. Smith, this Court should view those arguments with great skepticism.

Upon consideration of the overall body of evidence considered by Dr. Smith in evaluating whether benzene is capable of causing APL, together with the methods he employed to reach that opinion, this Court should come to the easy conclusion that Dr. Smith's opinions are sufficiently reliable to be admitted under Federal Rule of Evidence 702 and *Daubert*.

## II.     SUMMARY OF THE EVIDENCE

In support of the admissibility of Dr. Smith's opinions, Plaintiffs offer not only the testimony of Dr. Smith himself, but also the testimony of Dr. Carl Cranor, who has devoted a significant portion of his career to research and writing regarding the methods employed by scientists who assess causation. Plaintiffs offer Dr. Cranor's testimony under Fed. R. Evid. 104, solely for the Court's consideration in assessing the admissibility of Dr. Smith's testimony.   In opposition to Dr. Smith, Defendants have listed three experts: Dr. David Garabrant, Dr. David Pyatt, and Dr. John Bennett.  A summary of the opinions of these experts follows.

### A.     Plaintiffs' "Methodology" Expert, Dr. Carl Cranor.

#### 1.  Dr. Cranor's qualifications.

Carl Cranor is a full professor in the Department of Philosophy at the University of California at Riverside, where he has been a member of the Department of Philosophy since 1971.  He has a bachelor's degree in mathematics, with a minor in physics, and a PhD in philosophy.  For the last 27 years, Dr. Cranor's research has focused on philosophic issues concerning the interplay between science and the law in the context of risks posed by toxic substances. Since about 1985, Dr. Cranor has published approximately 50 articles or book chapters on such issues. Many of these articles and two of the books are on the use of scientific evidence in regulatory law or in toxic tort law. Dr. Cranor was elected in 1998 as a Fellow of the American Association for the Advancement of Science for outstanding contributions to science

4

policy, and he is an invited member of the Collegium Ramazzini, a "select group of Fellows [about 180] in the several regions of the world, each of clear personal distinction and integrity, distinguished by their contributions to occupational and environmental health." *See* Ex. 1, Report of Dr. Carl Cranor, at ¶¶4-7.

Dr. Cranor has served on numerous scientific, governmental, and regulatory committees on issues relating to risks posed by toxins. He was also an invited member of an international workshop regarding use of the "Bradford Hill factors" for evaluating causation evidence. That workshop included international experts from the U.S. and Europe, including some from the International Agency for Research on Cancer and the U.S. National Institute of Environmental Health Sciences. The title of the workshop was "Evaluating Evidence- A Review of the Bradford Hill Paper on Association and Causation, 1965-2005," and held at Imperial College, University of London, December 12-14, 2005.  Dr. Cranor routinely lectures to both his own students and to state and federal judges about scientific reasoning and the use of scientific evidence, in the context of risks from toxic exposures.   Ex. 1 at ¶¶6-10.

## 2.  Dr. Cranor's opinions in this case.

Dr. Cranor is offering opinions in this case regarding the methods employed by scientists in assessing "general causation" issues.  Plaintiffs tender Dr. Cranor's opinions solely for the benefit of the Court's deliberations regarding whether to admit Dr. Smith's causation testimony, and they do not intend to offer Dr. Cranor as an expert to testify before the jury in this case.

According to Dr. Cranor, scientists who investigate and assess issues of whether a particular chemical exposure is capable of causing a particular disease apply a nondeductive reasoning process known as "inference to the best explanation."   Ex. 1 at ¶13.  Deductive reasoning, which is used in the context of mathematics and formal logic, provides for a single

correct answer which is necessarily true, given the starting premises.  By contrast, nondeductive reasoning involves arguments that are not *guaranteed* to follow from their premises.   In nondeductive arguments, even if the premises are true, the inferential link between premises and conclusions will have varying degrees of strength, unlike a deductive argument. *Id.* Moreover, the given premises will provide support for different possible conclusions (or as some literature puts it, the evidence provided in the premises may be consistent with different explanations). "The task, then, in evaluating such inferences is to determine which conclusion is the most plausible (or best supported) given the premises (or which explanation best accounts for the evidence in the premises)." *Id.*

Dr. Cranor goes on to explain how scientists evaluating causation use the reasoning process of "inference to the best explanation" to reach conclusions. "There is widespread agreement that *all scientifically relevant information* bearing on possible explanations [for incidence of a particular disease] must be considered in drawing a conclusion about which explanation is most likely." Ex. 1 at ¶14E.  In the context of assessing causation, such evidence will include "human epidemiology studies, case reports, reviews describing a group of epidemiological studies, studies of effects of the exposure on animals, and a wide variety of experimental data – often conducted on intact animals, human cells *in vitro* and on model systems such as yeast, bacteria and mammalian cell lines -- showing the biological mechanisms through which the chemical may cause a disease, along with the metabolic pathways of the chemical in animals and humans." Ex. 1 at 14E(i).

Integrating all such relevant evidence to reach a conclusion is central to the process of evaluating causation:

> In assessing a substance's toxicity and integrating all available evidence, good
> scientific practice dictates that scientists consider available human evidence,

> evidence from experimental animals, scientific reviews, chemical structure-
> biological activity evidence, various kinds of mechanistic evidence (which may or
> may not be available), a range of experimental studies that could assist inferences
> and so on, in order to evaluate the conclusion that follows. The metaphor of fitting
> the pieces of a puzzle together to see what "picture" the totality of evidence
> provides is often used to describe this process.

Ex. 1 at ¶14F. This process of evaluating all of the available evidence on causation is often

referred to as the "weight of the evidence" process. *Id.* at ¶14I.  Such a "weight of the evidence"

review is employed by the various regulatory agencies and scientific bodies that evaluate cancer

risks posed by various chemicals, including the International Agency for Research on Cancer

("IARC") and the National Toxicology Program, which publishes the "Report on Carcinogens."

*Id.*

In evaluating the "weight of the evidence" relating to causation, scientists often look to

the nine considerations outlined by Sir Austin Bradford Hill in his paper, "The Environment and

Disease: Association or Causation?"  Hill's specific considerations to assist inference are: 1) the

strength of an association between an exposure and a particular disease, 2) consistency of the

association across different researchers studying the problem in different circumstances at

different times, 3) any specificity of the association (whether an exposure is associated with a

unique or highly unusual disease, as asbestos is associated with mesothelioma), 4) temporality

(the cause must precede the effect), 5) biological gradient or dose-response (is greater exposure

associated with a greater disease rate), 6) the biological plausibility of an association (is the

association biologically plausible given existing scientific knowledge), 7) coherency of the

association (is the association consistent with or does it conflict with what is known about the

disease and its natural history), 8) any relevant experimental data (do any experimental data or

semi-experimental data assist the inference for causation) and 9) analogy (do any biological

analogies to other diseases or associations assist the inference for causation). Ex. 1 at ¶16.

Dr. Cranor cautions that the Bradford Hill considerations must be evaluated with a few "important qualifications in mind." Ex. 1 at ¶16.  These qualifications include: 1) that, with the exception of temporality, none of the considerations is a *sine qua non* for a determination of causation; and 2) "Hill's factors are asymmetric. If they are present or applicable to the issue, he argues, they tend to strengthen the inference for causation, but if they are absent or inapplicable, they tend not to weaken it much [with the exception of the temporality consideration]." *Id.*

Throughout the process of evaluating the individual pieces of evidence and integrating that evidence to reach an overall conclusion, scientists evaluating causation must exercise judgment:

> scientific judgment has a crucial role at several points, not just in drawing a final conclusion. An expert reviews the body of data that appear to bear on causal judgments, selects the scientifically relevant data, assesses and weighs studies for their quality, weighs the importance of different kinds of data vis-à-vis one another (e.g., animal studies versus human studies versus short-term studies versus structure-activity relationships versus mechanistic evidence versus any case studies and so on), and brings her background understanding of biology and toxicology, as well as her understanding of the phenomena, to the causal issues. Scientific judgment also enters into integrating all the data and how it bears on evaluating different possible explanations in light of all the evidence and the particular phenomena to be explained (e.g., a disease).

Ex. 1 at ¶14F(ii).

Critically, "When professional judgment is so central to the drawing of inferences, professionals may disagree at various stages of reasoning in an inference to the best explanation, and thus may have disagreements about their overall view of the scientific conclusions."  Such scientific disagreements occur not only in the context of assessing disease causation, but even among scientists discussing science at its most fundamental level.  Ex. 1 at ¶14F; *see also* Ex. 2, Supplemental Cranor Report at ¶3 (noting that even Newton's basic laws of physics were eventually demonstrated to be incorrect). Different scientists often attach different degrees of

importance, significance, or weight to commonly-held considerations that guide scientific inquiry. "An end result is that there is reason to expect they will disagree about whether one theory or view is acceptable or not compared with another. And, this disagreement is quite reasonable among respectable scientists." Ex. 2 at ¶3.

### B.      Plaintiffs' General Causation Expert, Dr. Martyn Smith.

#### 1.      Dr. Smith's qualifications.

Dr. Martyn Smith is one of the world's most well-published, well-respected scientists in the field of benzene toxicology.   He is a Professor of Toxicology in the Division of Environmental Health Sciences, School of Public Health, University of California at Berkeley, where he has been a faculty member since 1982. Ex. 3, Report of Dr. Martyn Smith at ¶4. Dr. Smith received his Bachelor of Science Degree in Biology from Queen Elizabeth College, University of London (1977) and his Ph.D. in Biochemistry from the Medical College of St. Bartholomew's Hospital, London, England (1980). He performed post-doctoral research in the Department of Toxicology at the Karolinska Institute, Stockholm, Sweden (1980-1981) under the supervision of perhaps the world's leading toxicologist, Professor Sten Orrenius. Ex. 3 at ¶5.

In 1994, Dr. Smith was elected as a Fellow of the American Association for the Advancement of Science for his outstanding contributions to the field of environmental toxicology, especially with regard to developing scientific understanding of the mechanisms of benzene toxicity.   From 2000 to 2003, Dr. Smith served on the "National Advisory Environmental Health Sciences Council" which advises the National Institute of Environmental Health Sciences (NIEHS) of NIH on all decisions and future directions. Ex. 3 at ¶6.

Dr. Smith is a member of the editorial board of the journals *Cancer Epidemiology, Biomarkers and Prevention* and *Cell Biochemistry and Function* and previously served on the

board of other peer-reviewed journals, including *Environmental Health Perspectives*, *Biomarkers, Molecular Toxicology, International Journal of Toxicology, Advances in Pharmacology,* and *Free Radical Research*.  He has also served as a reviewer for numerous peer-reviewed journals, including the *Proceedings of the National Academy of Sciences; Toxicological Sciences; Blood; Cancer Research; Chemical Research in Toxicology; Carcinogenesis; Hematologica; Leukemia; Leukemia Research* and *Leukemia and Lymphoma*. Ex. 3 at ¶7.

Dr. Smith has devoted his career to the study of the toxic effects of chemicals and drugs on the human body, with particular emphasis on the mechanisms by which benzene and its metabolites cause damage at the cellular level and to the human organism as a whole.  The research in Dr. Smith's laboratory focuses on the causes of leukemia and lymphoma.  His research on benzene is funded by the National Institutes of Health and has been extensively peer-reviewed. Ex. 3 at ¶10.

Since 1979, Dr. Smith has authored or co-authored over 215 articles in peer-reviewed journals in the field of toxicology, 37 book chapters, and more than 150 abstracts, as well as technical reports for the United States Environmental Protection Agency and the California EPA. Many of these are on the subject of benzene toxicity.  Ex. 3 at ¶8; *see also* Ex. 4, Curriculum vitae of Dr. Martyn Smith.

**2.      Dr. Smith's opinion that benzene exposure is capable of causing APL.**

**a.      Methodology employed in assessing general causation.**

When reviewing the available literature relating to the human health risks associated with exposure to a particular chemical, in this case benzene, Dr. Smith applies a weight of the evidence ("WOE") approach.  In doing so he keeps in mind the list of considerations first

proposed by Sir Austin Bradford Hill for inferring general causation (the so-called "Hill considerations"). Hill, A.B. "The Environment and Disease: Association or Causation?," Proceedings of the Royal Society of Medicine, 58, 295-300 (1965). Such an approach requires one to review several form of evidence relating to the effects of exposure. These various types of evidence include human epidemiology studies, case reports, reviews describing a group of epidemiological studies, studies of effects of the exposure on animals, and a wide variety of experimental data – often conducted on intact animals, human cells *in vitro* and on model systems such as yeast, bacteria and mammalian cell lines -- showing the biological mechanisms through which the chemical may cause a disease, along with the metabolic pathways of the chemical in animals and humans. As Krimsky has discussed, "Each type of study may provide some evidence, but each has its limitations."[1] "If a chemical were known to be one of the causal agents responsible for a human disease then we would expect a series of evidentiary pathways to converge on that conclusion. … But not all of the evidence may be consistent with the result." Ex. 3 at ¶19 (quoting Krimsky).

Given Professor Hill's background as an epidemiologist, it is not surprising that several of the factors he lists focus on consideration of epidemiological evidence. He notes, however, that epidemiological evidence provides only one prong among the several types of evidence that should be considered in assessing causation. "The term WOE has come to mean not only a determination of the statistical and explanatory power of any individual study (or the combined power of all the studies) but the extent to which different types of studies converge on the hypothesis."[2] In assessing whether exposure to benzene may cause APL, Dr. Smith applied the

---

[1]   *See* Ex. 5, Sheldon Krimsky, Ph.D., *The Weight of Scientific Evidence in Policy and Law*, 95 Am. J. Public Health No. S1 at S130 (2005).

[2]   Ex. 5 at S130.

Hill considerations.  Nonetheless, application of those factors to a particular causal hypothesis, and the relative weight to assign each of them, is both context-dependent and subject to the independent judgment of the scientist reviewing the available body of data. "For example, some WOE approaches give higher weight to mechanistic information over epidemiological data."[3] Ex. 3 at ¶21.

According to Dr. Smith, experts may reasonably rely on mechanistic evidence of causation to reach a causation determination even in the absence of human epidemiology studies confirming the mechanistic evidence.  As described above, the consensus methodological approach to analyzing general causation issues requires examination of the weight of the evidence from all available modalities or types of studies.  Epidemiology studies provide an important piece of the puzzle, but the absence of epidemiology confirming strong mechanistic evidence does not preclude a determination of causation in every instance.  In addition, consideration of epidemiology in isolation, without concurrent exploration of mechanistic evidence, simply conflicts with mainstream scientific practice. Ex. 3 at ¶22.

A compelling line of mechanistic evidence demonstrating that exposure to a certain chemical leads to cancer effects would lead "most but not all scientists [to] conclude that such data provides indisputable evidence of human cancer risk despite a lack of epidemiological results specific to that agent."[4] "National and international agencies that provide evaluations of human health risks do not rely solely on associations observed in epidemiological studies.  Most

---

[3]  Ex. 5 at S135.

[4]  Ex. 6, Ronald L. Melnick, PhD,  *A Daubert Motion: A Legal Strategy to Exclude Essential Scientific Evidence in Toxic Tort Litigation*, 95 Am. J. Public Health No. S1 at S 32 (2005).  Dr. Melnick is a scientist at the Environmental Toxicology Program, National Institute of Environmental Health Sciences, National Institute of Health, which is an arm of the federal government within the Department of Health and Human Services.

often, no adequate studies have been performed, especially on newly introduced chemicals. Rather, expert multidisciplinary panels use all of the available and relevant scientific evidence in reaching their overall conclusions."[5] For example, with respect to TCDD, the most potent form of dioxin and dioxin-like compounds, both the International Agency for Research on Cancer ("IARC") and the National Toxicology Program ("NTP") have concluded that TCDD is a known human carcinogen, based on compelling mechanistic evidence supported by more limited evidence from epidemiology.[6] Ex. 3 at ¶23.

> **b.** **The nature of Acute Myeloid Leukemia ("AML"), including AML subtype "M3," Acute Promyelocytic Leukemia ("APL").**

Leukemia is a cancer of the blood-forming system and is defined as the uncontrolled proliferation of bone marrow progenitor cells. Due to their common stem cell origin, the various types of leukemias are related diseases which have common mechanisms of development and share a common general pathogenesis. They are, however, generally classified into four major types by the level of differentiation and cell type: acute or chronic myeloid leukemia (AML or CML) and acute or chronic lymphocytic leukemia (ALL or CLL). AML is the major form of acute non-lymphocytic leukemia (ANLL), which also includes biphentoypic leukemia with characteristics of both myeloid and lymphoid leukemia as well as AML. Ex. 3 at ¶13.

AML is sub-divided and classified morphologically, according to the French-American-British (FAB) classification system, by the degree of differentiation along different cell lines and the extent of cell maturation. M1, M2, and M3 show predominantly granulocytic differentiation and differ from one another in the extent and nature of granulocytic maturation; M4 shows both

---

[5]   Ex. 6 at S32.

[6]   Ex. 6 at S32.

granulocytic and monocytic differentiation; M5 shows predominantly monocytic differentiation; and M6 shows predominantly erythroblastic differentiation.   M7 is associated with leukemic megakaryocytes. Ex. 3 at ¶14.

AML-M3 is known as acute promyelocytic leukemia (APL), a cancer of the bone marrow in which there is a deficiency of mature blood cells in the myeloid line of cells and an excess of immature cells called promyelocytes. Ex. 3 at ¶16.   APL was first recognized as a distinct disease entity in 1957.  It accounts for 5-10% of cases of AML.  Thus, in a series of 20 cases of AML, one would only expect 1 or 2 cases of APL. The US National Cancer Institute SEER Program estimates that, in 2008, 13,290 men and women (7,200 men and 6,090 women) will be diagnosed with AML , and 8,820 men and women will die of that disease. Ex. 3 at ¶17.

APL is characterized by chromosome translocations involving the retinoic acid receptor-alpha gene on chromosome 17 (*RARa*).   In about 95% of cases of APL, the retinoic acid receptor-alpha (*RARa*) gene on chromosome 17 is involved in a reciprocal translocation with the promyelocytic leukemia gene (*PML*) on chromosome 15, a translocation denoted as t(15;17)(q22;q12).   However, four other gene rearrangements have been described in APL, fusing *RARa* to the promyelocytic leukemia zinc finger (*PLZF*), nucleophosmin (*NPM*), nuclear matrix associated (*NUMA*), or signal transducer and activator of transcription 5b (*STAT5B*) genes.   The resultant fusion proteins disrupt the function of RARa which blocks the normal maturation of granulocytes.   The chromosomal translocation involving *RARa* is believed to be the initiating event in APL and may be essential to the development of this subtype of AML. Ex. 3 at ¶18.

       **c.**      **Epidemiology studies of benzene-exposed populations have unequivocally established that benzene exposure causes AML.**

Many epidemiologic studies have been conducted of benzene-exposed workforces.

These studies generally show increased occurrences of AML among exposed workers when compared to unexposed workers or the general population.  The increased incidence of AML among the exposed workers in the studies is often statistically significant and dose-response relationships have been determined.   Based on these multiple epidemiologic studies, it is generally accepted by all governmental agencies and knowledgeable experts that benzene causes AML. There is also essentially no scientific debate among active researchers in the field that benzene causes all forms of AML. Ex. 3 at ¶15.

> **d.      Due to the rarity of APL, few epidemiological studies have focused on APL specifically, separate from AML as a group.**

The rarity of APL makes it difficult to study by traditional epidemiological methods. AML itself is a relatively rare disease, whose incidence is about 6 to 8 cases per 100,000 population.  Since APL comprises about 5-10% of AML, the incidence of APL can be estimated at about 3 to 8 cases per 1,000,000 population.  Ex. 3 at ¶24. Unfortunately, most epidemiological studies of AML causation are death certificate studies and the specific subtype is usually not listed or studied. It is very rare to find an epidemiological study which separates out the different sub-types of AML.  The most well-known epidemiological cohort studies of benzene exposed workers outside of China do not provide information about different sub-types of AML and consider AML as one disease.  Ex. 7, Supplemental Declaration of Martyn Smith at ¶7.

> **e.      Because toxicological evidence has clearly established that benzene exposure causes damage to the progenitor stem cell from which all of the subtypes of AML develop, epidemiological studies establishing that benzene causes AML as a group provide strong evidence that benzene causes all of the subtypes of AML.**

According to Dr. Smith, from an etiological point of view, the subtypes of AML are, in fact, subtypes of one disease in as much as they all derive from a genetically damaged

15

pluripotent stem cell which can differentiate into all myelogenous cell types and proliferate, developing the various AML subtypes.  Since the subtypes of AML all derive from a genetically damaged pluripotent stem or progenitor cell, they likely have a common pathogenesis.  Ex. 3 at ¶28a. The pathogenic process for APL, like all forms of AML, is for leukemic stem cells to be generated through the accumulation of chromosomal mutations and epigenetic changes. Ex. 7 at ¶33.  Many toxicology studies have established that the metabolites of benzene cause significant chromosomal damage at the stem cell level in the bone marrow. *See* Ex. 7 at ¶13; Ex. 3 at ¶¶33-36.  Thus, because epidemiological evidence has established conclusively that benzene exposure is capable of causing AML as a group, that same body of epidemiological evidence, when coupled with the pathological mechanism evidence described above, also strongly supports the conclusion that benzene exposure is capable of causing APL and all of the other specific subtypes of AML. Indeed, Dr. Smith opines that active researchers in the field of benzene toxicology do not even debate the issue of whether benzene exposure is capable of causing all of the subtypes of AML.  Ex. 3 at ¶15; Ex. 7 at ¶33.

> **f.** **The few epidemiological studies that have looked specifically at AML subtypes in benzene-exposed populations have shown that benzene-exposed populations have developed APL.**

If epidemiologic studies of benzene-exposed workers were devoid of workers who developed APL, one could hypothesize that benzene does not cause this particular subtype of AML.  However, APL has been reported among benzene-exposed workers in a number of epidemiologic studies, especially those of large populations conducted in China:

(a) In a multi-center case-control study of 1257 leukemia cases in China, odds ratios were calculated for benzene and certain AML subtypes.  The odds ratio for APL was 1.42, which was close to the odds ratios for subtypes M2a (1.58) and M5 (1.55) and greater than the other

subtypes (1.20). Chinese Epidemiologic Study Group of Leukemia and Aplastic Anemia, "Risk Factors Analysis of Leukemia and Aplastic Anemia in China," <u>Acta Academiae Medicinae Sinicae</u> 14(3):185-189 (1992) [in Chinese]. Thus, this study reported a greater than 40% increased risk of APL in benzene-exposed workers. Ex. 3 at ¶25(a).

(b) In a cohort study of 74,828 workers exposed to benzene in various factories in China, 32 cases of acute leukemia were found. Histopathologic data were evaluated for 9 exposed workers with AML. Of these, three were diagnosed with AML M2, one was diagnosed with AML M2 or M4, four were diagnosed with AML M3, and one was diagnosed with AML M4 or M5. Travis, L.B., et al., "Hematopoietic Malignancies and Related Disorders Among Benzene-Exposed Workers in China," <u>Leukemia and Lymphoma</u> 14:91-102 (1994). Thus, in this study, APL was the most common form of AML diagnosed in the benzene-exposed workers. Ex. 3 at ¶25(b).

(c) A multi-center Italian case-control study of 38 cases of APL showed a strong association with shoe-making (odds ratio = 6.3, 95% confidence interval = 1.3 - 31.1). Mele, A., et al., "Epidemiology of Acute Promyelocytic Leukemia," <u>Haematologica</u> 80:405-408 (1995). This study implicates benzene in the causation of APL, because for many years benzene was used as an adhesive in shoemaking in both Italy and Turkey. Ex. 3 at ¶25(e).

      **g.     The fact that benzene inhibits the enzyme topoisomerase-II provides substantial, additional evidence that benzene exposure causes APL.**

Besides the pathogenetic/epidemiological evidence described above, additional biological mechanism evidence strongly supports the conclusion that benzene exposure can cause APL. Toxicological evidence has shown that benzene's metabolites act as an inhibitor of a critical cellular enzyme known as topoisomerase-II. Topoisomerase II is an enzyme that is essential for the maintenance of proper chromosome structure and segregation; it removes knots and tangles

from genetic material by passing an intact double helix through a transient double-stranded break that it creates in a separate segment of DNA. Ex. 3 at ¶29.  A variety of widely prescribed anticancer drugs, such as etoposide, kill cells by increasing physiological levels of topoisomerase II-DNA cleavage complexes.  These drugs are referred to as topoisomerase II poisons (to distinguish them from catalytic inhibitors of the enzyme) because they convert this essential enzyme to a potent cellular toxin. *Id.*

Numerous studies have shown that Topoisomerase II inhibitors induce APL. "Therapy-related acute promyelocytic leukemia (t-APL) with the t(15;17) translocation is a well-recognized complication of cancer treatment with agents targeting topoisomerase II" (Hasan, S.K. et al., "Molecular analysis of t(15;17) genomic breakpoints in secondary acute promyelocytic leukemia arising after treatment of multiple sclerosis, Blood, 2008 Jul 23. [Epub ahead of print]).  Ex. 3 at ¶31.

Like the chemotherapeutic agents that have been established to cause APL, reactive benzene metabolites also inhibit the functionality of Topoisomerase II. Ex. 3 at ¶34. Recent studies have now convincingly shown that the benzene metabolites 1,4-hydroquinone and 1,4-benzoquinone enhance DNA cleavage mediated by human topoisomerase II. Ex. 3 at ¶35. Those studies show that reactive metabolites of benzene not only inhibit functionality of Topoisomerase II but are also potent Topoisomerase II poisons.  Since Topoisomerase II poisons not only cause AML but induce chromosomal translocations associated with APL, and since metabolites of benzene have been shown to be Topoisomerase inhibitors and poisons, there is strong biological and mechanistic evidence that exposure to benzene causes APL with its associated chromosome translocations involving the retinoic acid receptor-alpha (*RARa*) gene on Chromosome 17. Ex. 3 at ¶36.

    **h.**  **Based on Dr. Smith's review of the entire body of evidence described above, he concluded to a reasonable degree of scientific probability that benzene exposure can cause APL.**

Taking into account all of the available and relevant scientific evidence described above, Dr. Smith reached his "weight of the evidence" opinion that benzene exposure is capable of causing APL.  Ex. 3 at ¶37.  Defendants' experts, obviously, reached a different opinion, as described below.

   **C.**  **Defendants' Epidemiologist, Dr. David Garabrant.**

Dr. David Garabrant is a well-credentialed epidemiologist and occupational medicine physician who is on the faculty of the University of Michigan School of Public Health and the School of Medicine.  On Dr. Garabrant's list of testimony over the four-year period up to the time of his report in this case, he lists 65 appearances, all of which involved testimony provided at the request of defense counsel.  *See* Ex. 11, Excerpt from Depo. of Dr. David Garabrant, at 8; Ex. 12 (list of Dr. Garabrant's prior testimony).

Unlike all of the other experts in this case, Dr. Garabrant has not offered any opinions regarding the biological mechanisms of benzene toxicity, but has instead limited his opinions to discussion of the epidemiological evidence relating to benzene and APL.  Ex. 8, Report of David Garabrant at 5 ("I will not address the issue of biological plausibility which occupies the remainder of Dr. Smith's declaration because I understand that Dr. John Bennett, MD will address the underlying biology of APL and the mechanistic evidence that argues against benzene being capable of causing APL.")

According to Dr. Garabrant, "Dr. Smith provides no evidence that there is any association whatsoever between benzene exposure and APL." Ex 8 at 3.  Dr. Garabrant bases this comment on his review of the handful of epidemiological studies that have examined benzene-exposed

workers and that have also classified AMLs by subtype.  According to Dr. Garabrant, none of these subtype-specific benzene studies have shown any increased incidence of APL in the benzene-exposed population. *See* Ex. 8 at 3-4.  With the exception of one Chinese study about which Dr. Garabrant chooses not to comment,[7] even in these studies where the authors sought and reported information about AML subtypes, they still did not attempt to measure a quantified statistical association (such as a relative risk or odds ratio) between benzene exposure and APL specifically.  Indeed, Defendants' expert toxicologist, Dr. David Pyatt, could not name a single epidemiological study that had attempted to calculate a measure of association between benzene and *any* subtype of AML, including APL.  *See* Ex. 9, Excerpt from Depo. Testimony of Dr. David Pyatt at 47-49.  Similarly, no epidemiology study has sought to measure a statistical association between APL and solvent exposure or APL and petrochemical exposures.  *Id.*

Despite this dearth of APL-specific epidemiological evidence, Dr. Garabrant relies exclusively upon those few benzene studies that have reported any findings about APL specifically to reach his conclusions in this case. Based upon Dr. Garabrant's isolated interpretation of those few studies, he concludes that Dr. Smith "lacks completely a scientific basis for his assertion that benzene causes APL." Ex. 8 at 5.

### D.     Defendants' Toxicologist, Dr. David Pyatt

Dr. David Pyatt is a well-credentialed toxicologist employed by the consulting firm of Summit Toxicology, L.L.P.   Although Dr. Pyatt worked on laboratory "bench" research in

---

[7] *See* Ex. 10, Chinese Epidemiologic Study Group of Leukemia and Aplastic Anemia, "Countrywide Analysis of Risk Factors for Leukemia and Aplastic Anemia in China," Acta Academiae Medicinae Sinicae 14(3):185-189 (1992) [translated from Chinese]. In that study, the authors report a non-significantly elevated odds ratio of 1.42 for benzene-exposed workers and APL specifically. S*ee* Ex. 10 at 4 (Table 2); Ex. 3 at ¶25(a). Dr. Garabrant said he could not comment on the validity of the findings in that study or Dr. Smith's assertions about the study without a certified translation. Ex. 8 at 4.  However, Plaintiffs provided such a translation as part of their production of Dr. Smith's reliance materials.

toxicology as a graduate student and for about a two-to-three year period after receiving his PhD in 2001, today he characterizes his research work as "evaluation of other people's published data [and] published research."  Ex. 9 at 86-87. During his career, Dr. Pyatt has testified on behalf of defendants in benzene litigation on at least 12 occasions, not counting this case.  *See* Ex. 9 at 7-9; Ex. 13 (partial list of Dr. Pyatt's testimony).  He has never testified on behalf of a plaintiff in a personal injury case of any type. Ex. 9 at 43-44.

Like Dr. Garabrant, in this case Dr. Pyatt primarily relies upon his interpretation of the handful of epidemiology studies that have reported specific subtypes of AML in benzene-exposed populations to reach his opinion that "the scientific and medical data in existence are insufficient to establish a causal connection between benzene exposure and the development of APL." Ex. 14, Report of David Pyatt at ¶23.  In fact, Dr. Pyatt goes so far as to draw a broad methodological bright line with respect to assessing causation: "general causation <u>cannot</u> be determined in the absence of quantifiable epidemiological evidence." *Id*. at ¶20.  Dr. Pyatt agrees with Dr. Garabrant that no epidemiological studies have shown an association between benzene and APL specifically, and that the absence of such studies necessarily means that there is insufficient evidence to conclude that benzene exposure can cause APL.

Unlike Dr. Garabrant, however, Dr. Pyatt has also provided opinions in this case relating to the "biological mechanism" evidence relied upon by Dr. Smith as part of his weight of the evidence determination that benzene *can* cause APL.   First, Dr. Pyatt disagrees with Dr. Smith's conclusion that the scientific evidence demonstrates that metabolites of benzene inhibit topoisomerase-II. *See* Ex. 14 at ¶18. Second, Dr. Pyatt also believes that some, but not all, "topo-reactive" drugs are associated with APL.  *See* Ex. 9 at 18-20 (discussing differences between various topo inhibitors in relation to development of APL).  Third, Dr. Pyatt points to the

absence of specific findings in benzene-exposed workers of an increase in the (15;17) chromosomal translocation that is the hallmark of APL.  Ex. 14 at ¶16.  Dr. Pyatt admits, however, that he is aware of only one study that has looked for the (15;17) translocation in benzene-exposed workers. Ex. 9 at 27-28.

More significantly, Dr. Pyatt admits that scientific evidence regarding the pathogenesis of AMLs supports the conclusion that benzene exposure is capable of causing all subtypes of AML, including APL.  Specifically, Dr. Pyatt acknowledges that many scientists believe that all of the subtypes of AML develop from the same progenitor stem cell. Ex. 9 at 34-35.  He further acknowledges that the "hematopoietic progenitor cell population is a target tissue for benzene toxicity." Ex. 9 at 39.  Finally, Dr. Pyatt notes that these facts, taken together, provide evidence that benzene exposure is capable of causing APL. Ex. 9 at 39-40.

### E.    Defendants' Oncologist, Dr. John Bennett.

Dr. John Bennett is a board-certified oncologist who also practices as a hematopathologist, analyzing bone marrow and blood tissue for disease.  Dr. Bennett has testified on behalf of defendants in benzene litigation at least a dozen times, and he once testified on behalf of a plaintiff in a benzene case.  Ex. 15, Excerpt from Depo. of Dr. John Bennett at 25-26.

Like Drs. Garabrant and Pyatt, Dr. Bennett also criticizes Dr. Smith's general causation conclusion on the basis that Dr. Bennett does not believe that the epidemiology studies discussing benzene exposure and APL specifically demonstrate an association. Dr. Bennett also relies on his view that all benzene-related AMLs show a specific pattern of chromosomal abnormalities characterized by deletions in the 5 and/or 7 chromosome, which is not found in APL.  *See* Ex. 15 at 38-39.  Moreover, Dr. Bennett believes that leukemias that are secondary to

exposure to chemotherapeutic agents that are topoisomerase inhibitors also show a particular pattern of chromosomal abnormalities, which are different than the pattern observed among benzene-related AMLs.  Ex. 15 at 14-15.

Unlike Dr. Pyatt, Dr. Bennett agrees with Dr. Smith that two of benzene's metabolites – hydroquinone and benzoquinone – are topoisomerase-II inhibitors.  Ex. 15 at 17.  Dr. Bennett contends that the studies showing that these benzene metabolites inhibit topoisomerase-II have only been conducted on lymphocyte cells or "cell culture systems," rather than a cell "one would expect to see in a normal bone marrow sample."  Ex. 15 at 17-18.  However, Dr. Bennett acknowledges that he is unaware of any affirmative evidence showing that benzene's metabolites do not or cannot inhibit topoisomerase-II in a "normal" bone marrow cell.  *Id.*

## III.  DR. SMITH'S GENERAL CAUSATION OPINIONS EASILY SATISFY THE RELIABILITY REQUIREMENTS OF FED. R. EVID. 702 AND *DAUBERT*.

### A.  The Applicable Legal Standard for Admissibility of Scientific Testimony Under Fed. R. Evid. 702 and *Daubert*.

The admission of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying Rule 702, the U. S. Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) held that, in order to be admissible, scientific expert testimony must be both *relevant* and *reliable.* To determine whether scientific evidence is reliable, the Court enumerated four tests, or factors: (1) whether the scientific theory or technique can be (and has been) tested;

(2) whether the theory or technique has been subjected to peer review and publication; (3) whether a particular technique has a known potential rate of error; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-594.

Ordinarily, whether a theory or technique can be (and has been) tested will be a major factor in determining its admissibility. *Id.* at 593. Peer review and publication are also commonly relied-upon elements. *Id.* However, the factors that the Court enumerated do not function as a definitive checklist, and no single factor will dispose of the reliability inquiry. *See Id.* at 592-95; *Anello v. Shaw* Indus., No. 95-30234-FHF, 2000 U.S. Dist. LEXIS 6835, at *12 (D. Mass. Mar. 31, 2000) (holding lack of studies supporting plaintiff's expert's conclusions not sufficient to prevent admission of testimony); *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1229 (9th Cir. 1998) (finding district court abused its discretion by excluding expert testimony that was based on reliable methodology simply because "no epidemiological or animal studies" linked defendant's product to plaintiff's disease). Publication does not always correlate with reliability. *Daubert,* 509 U.S. at 593. Some ideas may be too new or of insufficient interest to have warranted publication, *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 151 (1999), and neither publication nor peer review is a *sine qua non* of admissibility. *Daubert,* 509 U.S. at 593.

The *Daubert* Court also imposed a special relevancy requirement. *See Daubert,* 509 U.S. at 591-92. "To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola Co.*, 161 F.3d 77, 81 (1st Cir. 1998); *See Daubert*, 509 U.S. at 591-92. In other words, Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592.

*Daubert* and its progeny represent a relaxing of the "general acceptance" test of *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (D.C. Cir. 1923); *Smith,* 2004 U.S. Dist. LEXIS 7011, at *8; *United States v. Green*, 405 F. Supp. 2d 104, 118 (D. Mass. 2005). The Supreme Court has expressed a preference for admitting evidence that may be borderline or "shaky." "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596; *Ruiz-Troche,* 161 F.3d at 85.

> **B.      Neither Fed. R. Evid. 702 Nor *Daubert* Empower this Court to Exclude Expert Testimony on the Basis That the Conclusions Reached Are Incorrect.**

"*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." *Ruiz-Troche*, 161 F.3d at 85. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion. *Ruiz-Troche*, 161 F.3d at 85. "As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert,* 509 U.S. at 590 (internal quotation marks omitted), it should be tested by the adversary process -- competing expert testimony and active cross-examination -- rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. *See id.* at 596.

Regardless of the criteria used to determine reliability, the burden on the party seeking admission of the testimony is not to establish the scientific certainty of the proposed testimony, but to show, by a preponderance of the evidence, that the testimony is based upon valid scientific principles and methodology. *Daubert*, 509 U.S. at 595 ("the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate"); *United States v. Vargas*, 471 F.3d 255, 265 (1st Cir. 2006) ("Once the district court finds that the expert's methodology is

reliable, the expert is allowed to testify as to the inferences and conclusions he draws from it");
*United States v. Monteiro*, 407 F.Supp. 2d 351, 357 (D. Mass. 2006) ("The critical inquiry is
whether the expert "employs in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field"). Nor does *Daubert* require or allow
the trial courts to determine which scientific position is most likely correct. Instead, the
proponent of the evidence need only show that it was achieved in a scientifically sound and
reliable manner. *Ruiz-Troche* 161 F.3d at 85.

"The inquiry envisioned by Rule 702 is a flexible one. Its overarching subject is the
scientific validity -- and thus the evidentiary relevance and reliability -- of the principles that
underlie a proposed submission." *Daubert,* 509 U.S. at 594-95. The essence of the trial court's
*Daubert* function is to determine whether the expert's opinion falls within the range of rational
scientific discourse – *not* to determine whether the expert's conclusions are either proven or
correct – that function still belongs to the jury. Good scientists, like good lawyers, disagree with
one another with tremendous frequency. Merely because two scientists have reached opposite
conclusions on the same issue does not mean that either of them used unreliable or unscientific
methods to reach their opinions. In United States Supreme Court Justice Stephen Breyer's
introduction to the Federal Judicial Center's REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, he
describes the story of a physicist who was asked if a certain scientific paper was wrong. The
physicist replied that "That paper isn't good enough to be wrong!" According to Breyer, it is
only *this* type of science that trial courts may properly exclude from evidence. Stephen Breyer,
*Introduction*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 1, 4 (2d ed. 2000).

Contrary to the views of some judges and litigants, application of proper scientific
methods does not generate a single correct result. This general truism certainly applies in the

area of assessment of causation in a toxic tort case.  As the currently-approved draft of the

American Law Institute's RESTATEMENT (THIRD) ON TORTS describes:

> scientists report that an evaluation of data and scientific evidence to determine
> whether an inference of causation is appropriate requires judgment and
> interpretation. Scientists are subject to their own value judgments and preexisting
> biases that may affect their view of a body of evidence. There are instances in
> which although one scientist or group of scientists comes to one conclusion about
> factual causation, they recognize that another group that comes to a contrary
> conclusion might still be "reasonable."  Judgments about causation may also be
> affected by the comparative costs of errors, as when caution counsels in favor of
> declaring an uncertain agent toxic because the potential harm it may cause if toxic
> is so much greater than the benefit foregone if it were permitted to be introduced.
> Courts, thus, should be cautious about adopting specific "scientific" principles,
> taken out of context, to formulate bright-line legal rules or conclude that
> reasonable minds cannot differ about factual causation.

American Law Institute, Proposed Final Draft No.1: Restatement (Third) of Torts: Liability for

Physical Harm § 28, comment c, at 484 (May 2005) (attached as Ex. 16).[8]

> ### C.     This Court Lacks Discretion to Exclude Testimony Based on Credibility Differences Created By the Exercise of Scientific Judgment.

In determining whether to admit Dr. Smith's opinions on general causation in this case,

this Court must keep in mind that different scientists, when using the Hill factors and the weight

of the evidence approach, may review the same body of evidence and nonetheless reach

divergent conclusions, because application of such methods requires considerable exercise of

judgment by the scientist.  The Restatement (Third) of Torts agrees:

> Whether an inference of causation based on an association is appropriate is a
> matter of informed judgment, not scientific methodology, as is a judgment
> whether a study that finds no association is exonerative or inconclusive. No

---

[8] At the 2005 annual meeting, the full membership of the ALI approved the Proposed
Final Draft No. 1, with respect to section 28, comment c, entitled "Toxic substances and disease,"
for inclusion in the third Restatement of Torts. *See* "Actions Taken with Respect to Drafts
Submitted at the 2005 Annual Meeting," available at: www.ali.org.  Because other draft sections
of the Third Restatement of Torts have not yet been approved, the full and final version of the
Restatement has not yet been published.

algorithm exists for applying the Hill guidelines to determine whether an association truly reflects a causal relationship or is spurious. Because the inferential process involves assessing multiple unranked factors, some of which may be more or less appropriate with regard to a specific causal assessment, judgment is required.

American Law Institute, Proposed Final Draft No.1: Restatement (Third) of Torts: Liability for

Physical Harm § 28, comment c, at 489 (May 2005).

A clash of opposing experts' conclusions provides no basis for this Court to exclude the testimony of either expert. In this case, although there are a few important methodological differences between the two sets of experts, the general methods applied by both sides are the same: as to general causation issues, review the available relevant evidence from the published literature studying the health effects of exposure, and apply the sets of factors set out by Sir Austin Bradford Hill to assess whether those studies support an inference of causation.

Despite this overlap in methodologies, the opposing parties' experts have reached hotly-disputed and conflicting conclusions, just as occurs in virtually every other lawsuit filed in contexts involving virtually any issue requiring expert testimony. Such a conflict among experts provides a classic example of a disputed issue of fact to be resolved by the jury:

The factfinder may be confronted with opposing experts, additional tests, experiments, and publications, all of which may increase or lessen the value of the expert's testimony. But their presence should not preclude the admission of the expert's testimony-they go to the *weight,* not the admissibility.

*Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

Defendants' request for this Court to exclude Plaintiffs' causation conclusions based on the conflicting opinions of their own experts reflects both a fundamentally flawed understanding of the scientific method and a badly distorted view of the constitutional limits on this Court's role in reviewing conflicting evidence. Defendants have asked this Court to intrude on the

exclusive province of the jury by weighing the credibility of two competing sets of scientists who have offered competing reasons for reaching different conclusions based on a the same or similar scientific methods. As this Court is aware, assessment of a witness's credibility is a task "solely within the jury's province." *United States v. Reyes*, 352 F.3d 511, 517 (1st Cir. 2003). "Trial courts should not arrogate the jury's role in evaluating the 'evidence and the credibility of expert witnesses' by 'simply choosing sides in the battle of the experts.'" *In re Joint Eastern & Southern Districts Asbestos Litigation*, 52 F.3d 1124, 1135 (2d Cir. 1995) (quoting *Christopherson v. Allied-Signal Corp.*, 924 F.2d 362, 366 (5th Cir. 1990)); *see also Sea Horse Marine Supplies, Inc. v. Puerto Rico Sun Oil Co.*, 295 F.3d 68, 81 (1st Cir. 2002) (noting that district court's authority to limit expert testimony does not extend to the "ultimate credibility determination" assigned to the jury).

## IV.    CONCLUSION

In this case, the expert whose testimony is at issue is without question one of the leading experts in the world with regard to the toxic effects of benzene exposure.  To reach his opinions, Dr. Martyn Smith has applied the standard, scientifically-accepted methods for assessing whether a toxic exposure is capable of causing a particular disease. And, in applying that "weight of the evidence" analysis to the available data, Dr. Smith has reached a conclusion, based on his weighing and interpretation of a number of different lines of evidence, including epidemiological studies, information about the common pathogenesis of all subtypes of AML, and information about the ability of benzene's metabolites to inhibit the critical enzyme, topoisomerase-II. Unsurprisingly, Defendants' experts have reviewed the same evidence and reached opposite conclusions, based on their own exercise of scientific judgment.  This clash of scientific

judgment presented here creates a classic credibility battle for the jury, but it provides no basis

for this Court to exclude Dr. Smith's testimony.

Plaintiffs respectfully pray this Court order that Dr. Smith's opinions be admitted.

Dated:  March 9, 2009.

Respectfully submitted,

BRIAN K. MILWARD and
LINDA J. MILWARD
Plaintiffs

By their attorneys

*/s/ James D. Piel*

Allen M. Stewart, Admitted *Pro Hac Vice*
Texas Bar No. 19202030
astewart@allenstewart.com

James D. Piel, Admitted *Pro Hac Vice*
Texas Bar No. 15989800
jpiel@allenstewart.com

Allen Stewart, P.C.
325 N. St. Paul Street, Suite #2750
Dallas, Texas  75201
(214) 965-8700 Office
(214) 965-8701 Facsimile

- and -

James D. Gotz, BBO # 567157
jgotz@kreindler.com

*Kreindler & Kreindler, L.L.P.*
277 Dartmouth Street
Boston, Massachusetts 02116
(617) 424-9100 Office

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2009 I caused to be served a copy of the foregoing to all counsel of record via the Court's ECF System.


*/s/ James D. Piel* _____
James D. Piel