### REPORT OF CARL F. CRANOR, PH.D., M.S.L.

I, Carl F. Cranor, Ph.D., M.S.L., hereby declare:

1. My name is Carl Forrest Cranor.

2. I have personal knowledge of the following matters and, if called to testify, I would competently testify to what follows.

3. This report on scientific inferential methodology with reference to general causation is submitted at the request of Plaintiffs' counsel.

### QUALIFICATIONS

4. I am a Distinguished Professor of Philosophy in the Department of Philosophy, University of California at Riverside. I was advanced to this specific title within the full professor rank in July 2008. Previously, I was employed as an Assistant Professor (1971-1978), Associate Professor (1978-1986), and Professor (1986-2008) at the University of California, Riverside. I have held various administrative positions in the Department of Philosophy as well as in the College of Humanities, Arts and Social Sciences during my career. Between 1983 and 1989 I served as Chair of the department. From 1990-1993 I served Associate Dean in the College of Humanities Arts and Social Sciences. In the academic year 1993-1994 I was Interim Dean of the College. In 1994 I returned to the Associate Dean position, which I held until 1999. In 1999-2000 I served as Special Assistant to the Dean. In addition, I have also chaired other departments on campus: Acting Director of Physical Education (Spring 1993, concurrent with Associate Dean service), Acting Chair of the History Department (1998-1999, concurrent with Associate Dean service), and Acting Chair of the Department of Hispanic Studies on two occasions totaling about 2 years (concurrent with Associate Dean Service). In 2005-2006 (and independently of service in the Dean's office), I was outside chair of the Department of Finance and Management Sciences in the A. Gary Anderson School of Management. Over a 15-year period I have been extensively involved with campus efforts to obtain approval for a law school. I have also had service on several systemwide University of California committees: on the Humanities Initiative (1993-1999), the Coordinating Board of the UC Water Resources Center (1987-1993), the Executive Committee of the Toxic Substances Research and Teaching Program (1989-2003, with a new appointment beginning in the Fall of 2008) and on several ad hoc UC President's Office committees. From 1994-1997 I was a member of the U.C. Health and Safety Oversight Committee of the National Laboratories (Los Alamos, Lawrence Livermore, and Lawrence Berkeley). I also served on several Academic Senate Committees to the extent that administrative service as department chair, Associate Dean, or Interim Dean would permit (one cannot do both).

5. I received my Bachelor of Arts Degree in Mathematics from the University of Colorado (1966, with honors in Mathematics and General Studies) with a minor in Physics, and my Ph.D. in Philosophy from the University of California, Los Angeles (1971). I also hold a Master of Studies in



PLAINTIFF'S EXHIBIT

Law from Yale Law School (1981). My early research was in moral and legal philosophy with a focus on Kant and Kantian moral philosophy. However, in the late 1970's I sought to bring together my interests in legal and moral philosophy with my interests in the environment and environmental health protections. Following receipt of the M.S.L. from Yale Law School and a Congressional Fellowship in 1985-86, this has resulted in a program of research for the last 27 years that has focused on philosophic issues concerning risks, science and the law. More specifically the work focused on risks from potentially toxic substances. I teach a variety of philosophy courses, several law-related undergraduate classes as part of our Law and Society Program, of which I was a co-founder (1974), and graduate seminars in philosophy, usually focusing on philosophic issues concerning risks, science and the law. In law and science classes I often have a segment on inference to the best explanation and scientific studies.

      6. In 1998 I was elected as a Fellow of the American Association for the Advancement of Science for outstanding contributions to science policy, and in 2004 elected as a Fellow of the Collegium Ramazzini. The Collegium invitation letter describes elected fellows as part of "a select group of Fellows [about 180] in the several regions of the world, each of clear personal distinction and integrity, distinguished by their contributions to occupational and environmental health." I have been a member of a National Academy of Sciences Committee to Czechoslovakia (1989) and an Institute of Medicine Committee to Evaluate Measures of Health Benefits for Environmental, Health, and Safety Regulation (2003-2005), which resulted in a book *Valuing Health: Cost Effectiveness Analysis for Regulation,* eds. Wilhelmine Miller, Lisa A. Robinson, and Robert S. Lawrence, with the committee, including myself as co-authors. The research described in the next section has led to service on several science advisory panels (SAPs) (California's Proposition 65 SAP (1989-1992), California's SAP on Electric and Magnetic Fields (1999-2002), and a UC Irvine Scholar's Committee on Perchlorate Review (2002-2003)). I have also served on various peer-review panels: the Coordinating Board, University of California Water Resources Center (1987-1993), National Science Foundation, Ethics and Value Studies (1992-1994), U.C. Biotechnology Research and Education Program (1995-96), National Science Foundation, Population Biology, Human Genome Diversity Project (1996), National Science Foundation, Site Visit Team, University of Chicago's Science and Technology Center (January, 1999), Executive Committee, University of California Toxic Substances Research and Teaching Program (1989-2002; 2008-onward), and National Science Foundation, Societal Dimensions of Nanotechnology, 2003. I regularly serve as a referee for a variety of publications in philosophy, risk assessment, philosophy of science and law, and occasionally science journals such as *Environmental Health Perspectives* and *Risk Analysis*.

      7. Since 1971 I have authored or co-authored 4 books or monographs, a report for Congress on identifying and regulating carcinogens, about 70 articles in peer reviewed journals or book chapters, as

CRANOR000018

well as a small number of proceedings, encyclopedia articles, book reviews, review articles and abstracts. I have also edited a book on the human genome project. Early publications were in moral or legal philosophy. Since about 1985 I have published approximately 50 articles or book chapters on philosophic issues at the interface of risks, science and the law. Many of these articles and two of the books are on the use of scientific evidence in regulatory law or in toxic tort law.

    8. Publications that are relevant to the use of scientific evidence in the tort law and to scientific reasoning include: *Toxic Torts: Science, Law and the Possibility of Justice* (Cambridge and New York: Cambridge University Press, 2006, 2007); "A Framework for Assessing Scientific Arguments: Gaps, Relevance, and Integrated Evidence," XV *Journal of Law and Policy*, 7-58 (2007); "Scientific Ignorance and Reliable Patterns of Evidence in Toxic Tort Causation: Is There a Need for Liability Reform?" (with David A. Eastmond) *Law and Contemporary Problems*, Vol.64, No. 4 (Autumn 2001), 5-48; "Judicial Distortion of Science and the Handicapping of Justice in US Law," *European Journal of Oncology*, vol. 12, n. 4, pp. 229-234 (2007); "The Use of Empirical Evidence to Assess and Critique Judicial Decisions about Science," *Midwest Studies in Philosophy: Philosophy and the Empirical*, Vol. XXXI (2007), pp.1-25; Guest Editorial, "Science with Health Consequences," *International Journal of Occupational and Environmental Health*, Vol. 12, Number 2 (2006), pp. 177-179; "The Dual Legacy of *Daubert v. Merrell-Dow Pharmaceuticals*: Replacing Junk Science with Insidious Science," in *Rescuing Science from Politics*, ed. Wendy Wagner and Rena Steinzor (Cambridge and New York: Cambridge University Press, 2006), pp. 120-142; "Scientific Inferences in the Laboratory and the Law," *American Journal of Public Health, Supplement 1: Scientific Evidence and Public Policy* Vol. 95, No. S1 (July 2005), 121-128 (Reprinted in *TRIAL*, (November 2005), pp. 46-57); "The Science Veil over Tort Law Policy: How Should Scientific Evidence Be Used in Toxic Tort Law?" *Law and Philosophy*, 24:2 (March, 2005): pp. 139-210; "*Daubert* and the Acceptability of Legal Decisions," the *Law and Philosophy Newsletter* November, 2003, pp. 127-131, (Reprinted in the *Journal of Philosophy, Science and Law);* "Justice, Inference to the Best Explanation and the Judicial Evaluation of Scientific Evidence," *Topics in Contemporary Philosophy: Vol. III: Law and Social Justice*, ed. Joseph Keim Campbell, Michael O'Rourke, and David Shier (Cambridge, MA:MIT Press, 2005), pp. 67-103 , "Judicial Boundary-Drawing and the Need for Context-Sensitive Science in Toxic Torts after *Daubert v. Merrell-Dow Pharmaceutical*", (with David A. Eastmond and John G. Fischer), 16 *The Virginia Environmental Law Journal*, 1-77 (2001). In addition to these publications, I was a participant in an international workshop reviewing Austin Bradford Hill's paper, "Environment and Disease: Association or Causation?"[1] This workshop included international experts from the U.S. and Europe including some from the International Agency for Research on Cancer and the U.S. National Institute of

---

[1] Austin Bradford Hill, "The Environment and Disease: Association or Causation?" 58 *Proc. Royal Soc'y of Med.* 295, 300 (1965), reprinted in *Evolution of Epidemiologic Ideas: Annotated Readings on Concepts and Methods* 15-20 (Sander Greenland ed. 1987).

CRANOR000019

Environmental Health Sciences. The title of the workshop was "Evaluating Evidence- A Review of the Bradford Hill Paper on Association and Causation, 1965-2005," and held at Imperial College, University of London, December 12-14, 2005. I delivered a presentation, "Use of Bradford Hill Factors in U.S. Toxic Tort Cases." My Curriculum Vitae is attached hereto as Exhibit "A" and is incorporated herein by reference for all purposes. I charge an hourly rate of $250 per hour for my professional time spent working on this matter on all tasks other than providing testimony at depositions, hearings or trial. I charge an hourly rate of $400 per hour for my professional time in providing testimony at depositions, hearings and trial

9. I have spent a good portion of my career considering the use of scientific evidence in the law. Early research focused on regulatory issues, but recent research addressed scientific reasoning and the utilization of scientific evidence in tort law. My book, *Toxic Torts: Science, Law and the Possibility of Justice*, aimed to provide to readers an accessible and fairly detailed view of the science needed for carcinogenic toxicity judgments, as well as a guide to scientific reasoning and scientific hedging. It also sought to present an accessible view of some of the subtleties of the case law on these issues to scientists and others. Finally it discusses the philosophic adjudication of the law-science interaction.

10. I have lectured to federal and state judges about scientific reasoning and the use of scientific evidence. I participated in Brooklyn Law School's Science for Judges Project, co-sponsored by Federal Judicial Center, the National Center for State Courts, and the National Academies of Science's Committee on Science, Technology and Law, presenting "The Structure of Scientific Arguments: Gaps Relevance and Integrated Evidence," March 3, 2006. I also served as a faculty lecturer for the at the University of California/Judicial Council Summit: Orientation to Courts and Decision-Making," March 22, 2006; presented "Scientific Arguments and Some Evidentiary Foundations," to the Continuing Judicial Studies Program, sponsored by the California Center for Judicial Education and Research, Judicial Council of California, October 23-24, 2006 (Morning speaker) and presented "Causation: The Structure of Scientific Arguments," to 2007 California Bench-Bar Bi-Annual Conference, September 26-30 at the Hilton Hotel in Anaheim, September 27, 2007. In addition, I have made similar presentations to lawyers as part of a nascent project on science in the law at the University of California, Riverside: Judicial Case Conference (part of a project to involve UCR in the education of state and federal judges concerning science), UCR, October 13-14, 2004 and "Science 101: Some Science for Lawyers," UCR Extension, July 12, 2008.

11. I have done almost no consulting in legal cases. I was retained by plaintiffs' attorneys in *In Re Redlands Tort Litigation* to address issues of unreasonable risk, but gave depositions and have not testified further in that case. On rare occasions I have informally given advice to both plaintiff and defense attorneys on scientific arguments without charge. That testimony was more than four (4) years ago.

## GENERAL BACKGROUND ON INFERENCES TO THE BEST EXPLANATION AND SCIENTIFIC INFERENCES

4

CRANOR000020

12. Arguments in support of conclusions are of two kinds: deductive and nondeductive.[2] Deductive arguments are typical of mathematics and formal logic. The defining property of such arguments is that the conclusion is "guaranteed" logically or semantically by the premises: if the premises are true, the conclusion must be true.[3] In a deductively valid argument, if the conclusion is false, at least one of the premises must be false as well. Or, if one accepts the truth of the premises, but rejects the truth of the conclusion in a valid argument, one contradicts oneself.[4] For instance, if one accepts that A = B and B = C, but denies that A = C, on the face of the argument one contradicts oneself. Logical "tightness" gives deductive arguments great inferential power, as the success of mathematics and formal logic shows. Theorems of mathematics or logic are derived by deductive reasoning.  However, deductive arguments are of comparatively limited use in making empirical inferences about the world.[5]

13. By contrast, nondeductive arguments are those whose conclusions are not guaranteed by their premises.[6] These are typically utilized in support of empirical claims, e.g., an explanation of the ocean tides, of a mother's ingestion of the pharmaceutical diethylstilbestrol causing vaginal/cervical cancer in her daughters when they reach their late teenage years, of vinyl chloride causing a rare form of liver cancer, or of benzene causing leukemia. Theorists have used various names to refer to such arguments:  "inferences  to  the  best  explanation," "diagnostic  arguments," "diagnostic induction," "inductive arguments," and "differential diagnosis." In nondeductive arguments even if the premises are true, the inferential link between premises and conclusions will have varying degrees of strength, unlike a deductive argument.[7] Thus, in a nondeductive argument the premises will provide strong, weak, or moderate support for the conclusion; one might say that the argument will be strong or weak or in between, but not valid or invalid. Moreover, the given premises will provide support for different possible conclusions (or as some literature puts it, the evidence provided in the premises may be consistent with different explanations).[8] The task, then, in evaluating such inferences is to determine which conclusion is the most plausible (or best supported) given the premises (or which explanation best accounts for the evidence in the premises).

14. There are several major steps in using nondeductive reasoning to make inferences to the best explanation for the causes of disease.  What follows below is something of a formal description of that process. Actual researchers may in fact follow such a procedure, but not explicitly discuss each general step. The general inferential methodology can be so deeply ingrained that some steps are implicit and

---

[2] Larry Wright, *Practical Reasoning* 38-46 (1989).
[3] Ibid.
[4] Ibid. at 40.
[5] Ibid. at 38-46.
[6] Ibid.
[7] Ibid.
[8] Ibid at 107-111.

CRANOR000021

possibly not explicitly articulated by working scientists, yet utilized nonetheless.

A) A typical first step that would lead to an interest in disease causation is that a researcher may notice something that needs understanding or calls for an explanation.[9] This might be a correlation or association between some exposure or condition and a disease. Once such a correlation has been observed, it invites an explanation, if it is sufficiently interesting scientifically, or of public health concern. For example, in a polyvinyl chloride plant in Kentucky in the mid-1970s, occupational physicians noticed three individuals with angiosarcoma of the liver (an extremely rare liver cancer).[10] Subsequently, they identified ten other cases at vinyl chloride plants in the U.S.[11] Scientists would pose several questions about such phenomena: Does this observed correlation have a causal explanation or not? If it does, what is it?

B) Second, in trying to understand casual relationships a researcher would consider a sufficiently complete range of plausible explanations to account for the evidence.[12] For this step, some philosophers would emphasize finding a list of plausible explanations to try to account for the phenomena, and would argue that this is based on scientists' experience, expertise, background knowledge, and other evidence of the effects.[13] This is my preferred way of describing it. Bayesian-oriented theorists would talk of "conditioned properties."[14] (I do not use this description.) For general causation issues concerning exposures in a workplace, the range of plausible rival explanations is more limited. Possible explanations might be: an occupational exposure can cause the effect, the occupational exposure cannot cause the effect, the occupational exposure does not cause the effect, or perhaps any observed risks associated with occupational exposure are a matter of chance. When scientists sought to identify the cause of angiosarcoma at the polyvinyl chloride (PVC) plants, they had a comparatively short list of possible causes from which to seek an explanation, but they also blurred general causation and specific causation issues in their analysis—excessive alcohol usage, exposure to arsenic compounds, exposure to thorium dioxide, bad luck, and a possible new cause, exposure to vinyl chloride monomers (VCM).[15] Alcohol usage and some of the other exposures might have been pertinent to some individuals, but not all (and thus more matters analogous to specific causation).

C) Third, scientists would then rank (at least implicitly) the plausible rival explanations

---

[9] Ibid., at 99-121; Larry Wright, *Critical Thinking: An Introduction to Analytical Reading and Reasoning*, p. 200, and Paul Thagard, How Scientists Explain Disease 129 (1999).

[10] J.L. Creech, Jr. & M.N. Johnson, "Angiosarcoma of Liver in the Manufacture of Polyvinyl Chloride," 16 *Journal of Occupational Medicine* 150-151 (1974).

[11] Clark W. Heath, Jr., Henry Falk & John L. Creech, Jr.," Characteristics of Cases of Angiosarcoma of the Liver among Vinyl Chloride Workers in the United States", 246 *Annals New York Academy of Sciences* 231 (1975).

[12] Wright, *Practical Reasoning* at 99-102

[13] Ibid., at 99-104, esp. 103.

[14] Brian Skyrms, *Choice and Chance: An Introduction to Inductive Logic Third Edition* (Belmont, CA: Wadsworth Publishing, 1986) at 89.

[15] Heath, et al., at 234.

CRANOR000022

according to their degree of plausibility or initial support based on the evidence available at the time.[16] Such evidence would include both evidence collected at the time of the investigation and background knowledge about the subject being studied. Plausibility rankings would refer to "the list of rival explanations [to explain what is going on] in the order of their plausibility."[17] Thus, "[w]hen we judge the [explanatory] rivals [of nondeductive arguments] to be more or less plausible, we are *estimating how well or badly they explain what happened*, or what is going on, given what we know about it."[18] Such plausibility judgments have degrees of gradation or degrees of strength.[19] Scientists develop skills in ranking the different conclusions from the premises based on their plausibility and their background knowledge.[20] Such skills are quite important for them and the explanations they consider within their fields. It is not clear what was the most plausible initial explanation of the liver cancer among polyvinyl chloride workers; perhaps the earliest might have been mere chance, but the prevalence of several rare instances of disease at one plant probably quickly lowered that explanation's plausibility.

D) Fourth, the initial plausibility rankings would in turn provide clues about what other evidence might be available that would distinguish between the explanations.[21] Scientists would seek additional evidence to separate the more plausible from the less plausible explanations. What research in the form of tests, studies, or background information could help discriminate between different explanations and assist the search for a best explanation? Often, finding such information is much easier said than done. Sometimes experiments cannot be conducted; studies available may not directly address needed issues; diseases may be sufficiently rare, or, conversely, sufficiently common that they are difficult to detect; disease processes can be too complex at present to discern causes and so on.[22] This could be especially problematic for the law where studies may have not been explicitly designed to address the legal questions. In the PVC plant case, once researchers suspected that an occupational exposure might have caused the cancers, they sought evidence from other PVC plants as well as animal studies, and other scientific evidence. They found some earlier evidence that animals exposed to vinyl chloride contracted similar diseases, as well as the 1972 preliminary results of a study by Cesare Maltoni in Italy, which reinforced their considerable initial concerns based on case reports that exposure to vinyl chloride monomers caused angiosarcoma.[23]

E) Fifth, there is widespread agreement that *all scientifically relevant information* bearing on possible explanations must be considered in drawing a conclusion about which explanation is most

---

[16] Wright, *Practical Reasoning,* at 93-96.
[17] Ibid. at 101.
[18] Ibid. at 107 (emphasis added).
[19] Ibid. at 47, 95-96.
[20] Ibid. at 97-98.
[21] Ibid. at 103-06.
[22] Thagard, at 131; Carl F. Cranor, *Toxics Torts; Science, Law and the Possibility of Justice* (2006) 170-82.
[23] Gerald Markowitz & David Rosner, *Deceit and Denial: The Deadly Politics of Industrial Pollution,* 182-83 (2002); Cesare Maltoni, "Predicitive Value of Carcinogenesis Bioassays," 271 *Annals N.Y. Acad. Sci.* 431 (1976).

CRANOR000023

likely.[24] Hutchinson and Lane put this point especially strongly: "A causality assessment method must respect Fisher's fundamental rule of uncertain inference--*never throw information away*. That is, any fact, theory or opinion that can affect an evaluator's belief that [a particular exposure] caused an adverse event E must be incorporate by the method into the 'state of information' on which the assessment is based."[25]

i) There are a variety of kinds of studies that would be automatically considered as belonging to the body of evidence a scientist would need to review as possibly bearing on causal inferences. Professor Smith nicely summarizes the range of evidence: "human epidemiology studies, case reports, reviews describing a group of epidemiological studies, studies of effects of the exposure on animals, and a wide variety of experimental data – often conducted on intact animals, human cells *in vitro* and on model systems such as yeast, bacteria and mammalian cell lines -- showing the biological mechanisms through which the chemical may cause a disease, along with the metabolic pathways of the chemical in animals and humans."[26] Out of the range of types of evidence scientists would normally review, scientifically relevant information is information that has any impact on the probability of a scientist's conclusions and the plausibility of explanations.[27] The standard for what constitutes "relevant" information is quite minimal, since typically *any information* that can affect a scientist's belief, ranking of possible explanations, probability of conditioned properties or conclusions should be included. Scientific standards of relevant information are strikingly similar to legal standards of relevant information.[28] When scientists were trying to identify the causes of angiosarcoma in PVC plants, no epidemiological studies were available. However, there were good case reports from the Kentucky plant, as well as a few from some other PVC plants, revealing surprising clusters of an unusually rare disease,[29] as well as animal studies that greatly assisted the inferences.[30] All of this was relevant evidence.

ii) What constitutes scientifically relevant information or data that should be considered contributing to a scientific conclusion is a matter of a scientist's judgment.[31] This is not intended to be a tautology, but to make the point that *scientists have the substantive expertise to assess what is relevant for making scientific inferences.* Moreover, there may well be some disagreement between scientists on this issue, although there may be less disagreement about what is relevant evidence than there will be

---

[24] Thagard, at 129; Tom A. Hutchinson & David A. Lane, "Assessing Methods for Causality Assessment of Suspected Adverse Drug Reactions," 42 *J.Clinical Epidemiol.* 5 (1989). See also Jerome P. Kassirer & Joe S. Cecil, "Inconsistency in Evidentiary Standards for Medical Testimony: Disorder in the Courts," *J. Am. Med. Ass'n* 1382, 1386 (Sept. 18, 2002) (noting writers from different methodological perspectives who agree on this point).
[25] Hutchinson & Lane, at 10 (emphasis added).
[26] Declaration of Martyn Smith, Paragraph 22.
[27] Wright, *Practical Reasoning*, at 104; Wright, *Critical Thinking*, at 206-17.
[28] Kenneth S. Broun et al., *McCormick on Evidence* 541-542 (Edward W. Cleary ed., 3d ed. 1984); Fed. R. Evid. 401.
[29] Heath, et. al., at 232.
[30] Cesare Maltoni, "Predicitive Value of Carcinogenesis Bioassays," 271 *Annals N.Y. Acad. Sci.* 431 (1976); Gerald Markowitz & David Rosner, 182-83 (2002).

CRANOR000024

when assessing other aspects of scientific arguments. This is not to say that a relevance judgment is totally subjective or that it can be idiosyncratic; peers can correct other experts. Scientists may differ about relevance judgments, but this is likely to be unusual, simply because satisfying relevance considerations tends to be quite easy.[32] In particular, even in cases in which overall scientific conclusions might be controversial, what constitutes relevant data may be less controversial than the conclusions drawn from the data.

F) Sixth, central to a scientist's drawing conclusions about disease causation or other scientific conclusions is his or her need to *integrate all the available relevant evidence*, and utilizing his or her judgment to come to a conclusion about the best explanation.[33] In assessing a substance's toxicity and integrating all available evidence, good scientific practice dictates that scientists consider available human evidence, evidence from experimental animals, scientific reviews, chemical structure-biological activity evidence, various kinds of mechanistic evidence (which may or may not be available), a range of experimental studies that could assist inferences and so on, in order to evaluate the conclusion that follows.[34] The metaphor of fitting the pieces of a puzzle together to see what "picture" the totality of evidence provides is often used to describe this process.[35]

i) At the International Agency for Research on Cancer (IARC), for example, the scientific committees explicitly go through a stepwise process that is slightly different from the one described here, but sufficiently similar to it that it is clear the committees are utilizing inferences to the best explanation. The committee considers any evidence that a substance causes cancer in humans, and evidence that it causes cancer in animal studies. These lines of evidence are then combined to provide a default evaluation of the substance's likelihood of causing cancer in humans. The committee then considers mechanistic and other kinds of evidence to "determine whether the default evaluation should be modified." [36] The current director of that program emphasizes the role of scientific judgment in integrating evidence and coming to conclusions in scientific argument. "The final overall evaluation is *a matter of scientific judgment, reflecting the weight of the evidence derived from studies in humans, studies in experimental animals, and mechanistic and other relevant data.*" [37] This view of the IARC process makes explicit that professional judgment is central to drawing scientific inferences from evidence judged to be *relevant*. A somewhat similar procedure is followed at the U.S. National

---

[31] Wright, *Practical Reasoning*, at 104.
[32] Wright, *Critical Thinking* at 206-17.
[33] V.J. Cogliano, R.A. Baan, K. Straif, Y. Grosse, M. Secretan, F. El Ghissassi & P. Kleihues, "The Science and Practice of Carcinogen Identification and Evaluation," 112 *Environmental Health Perspectives* 1269, 1272 (2004); Institute of Medicine and National Research Council, Committee on the Framework for Evaluating the Safety of Dietary Supplements, *Dietary Supplements: A Framework for Evaluating Safety* (2005) at 255-56, 262.
[34] Cogliano, *et. al.*, "The Science and Practice of Carcinogen Identification and Evaluation," 1269, 1272.
[35] Susan Haack, Trial and Error: The Supreme Court's Philosophy of Science, 95 *American Journal of Public Health*, (Suppl. 1) S66, S70 (Suppl. 1 2005); Margaret A. Berger, "What Has a Decade of Daubert Wrought?" 95 *American Journal of Public Health* S59, S60 (Suppl. 1 2005).)
[36] Cogliano, *et. al.*, 1272.
[37] Ibid. (emphasis added).

CRANOR000025

Toxicology Program: "Conclusions regarding carcinogenicity in humans or experimental animals are based on *scientific judgment*, with consideration given to *all relevant information*. Relevant information includes, but is not limited to, dose response, route of exposure, chemical structure, metabolism, pharmacokinetics, sensitive sub-populations, genetic effects, or other data relating to mechanism of action or factors that may be unique to a given substance."[38]

   ii) Moreover, scientific judgment has a crucial role at several points, not just in drawing a final conclusion. An expert reviews the body of data that appear to bear on causal judgments, selects the scientifically relevant data, assesses and weighs studies for their quality, weighs the importance of different kinds of data vis-à-vis one another (e.g., animal studies versus human studies versus short-term studies versus structure-activity relationships versus mechanistic evidence versus any case studies and so on), and brings her background understanding of biology and toxicology, as well as her understanding of the phenomena, to the causal issues. Scientific judgment also enters into integrating all the data and how it bears on evaluating different possible explanations in light of all the evidence and the particular phenomena to be explained (e.g., a disease).

   iii) An expert considers and integrates all scientifically relevant evidence in order to assess what it shows. Then the expert enters into an assessment of the strength of the best explanation vis-à-vis alternative explanations. As both medical and legal commentators put the point: "In the final analysis, assessment of evidence and causal inferences depend on accumulating all potentially relevant evidence and *making a subjective judgment about the strength of the evidence*."[39] When professional judgment is so central to the drawing of inferences, professionals may disagree at various stages of reasoning in an inference to the best explanation, and thus may have disagreements about their overall view of the scientific conclusions. Such judgments concerning relevant evidence and the strength of explanations compared with one another occurs not only in discussions of disease causation, but throughout science, even science at the most fundamental level, such as basic explanations in physics.[40]

   G) Finally, the search for causal understanding takes into account all relevant information, and focuses on how much more likely or plausible an effect is with a cause than without that cause.[41] For example, was it more plausible that employees in the polyvinyl chloride plants contracted their liver cancer as a matter of coincidence (or chance) or from exposure to thorium oxide, alcohol consumption, arsenic compounds, or the vinyl chloride monomer?

   H) The overall strategy sketched above in the search for explanations is broadly similar across

---

[38] National Toxicology Program, *11ᵗʰ Annual Report on Carcinogens*, p. 2 of Introduction, located at http://ntp.niehs.nih.gov/ntp/roc/eleventh/intro.pdf (emphasis added).
[39] Kassirer & Cecil, at 1384. See also Jerome P. Kassirer, "Diagnostic Reasoning," Annals of Internal Medicine 110, 893-894 (1989).
[40] Thomas Kuhn, "Objectivity, Value Judgment and Theory Choice," in *The Essential Tension* (Chicago: The University of Chicago Press, 1977), 320–339.
[41] Thagard, at 102; Wright, Practical Reasoning at 107.

CRANOR000026

many fields that utilize nondeductive arguments. It is widely endorsed by epidemiologists,[42] toxicologists, methodologists inferring causes from well-analyzed case studies,[43] scientific committees identifying toxicants,[44] governmental scientists assessing risks,[45] investigators seeking to explain airplane or space shuttle accidents, and ordinary persons making empirical inferences.

I) The strength of scientific inferences depends both on the truth of the evidentiary claims in the premises and on the *cumulative support* that all the relevant evidence contained in the premises offers for the conclusions in question.[46] Another name often used for these arguments is "weight-of-the-evidence" arguments, illustrating this "strength" point about which conclusion has the stronger support.[47] This is a term from both scientific and regulatory contexts. For example, IARC committees, international scientific committees that identify carcinogens, note that for the conclusions of a report "the final overall evaluation [of evidence that a substance is carcinogenic to humans] is a matter of scientific judgment, reflecting the *weight of the evidence* derived from studies in humans, studies in experimental animals, and mechanistic and other relevant data."[48] As already indicated the National Toxicology Program utilizes a similar procedure. The metaphor "weight-of-the-evidence" is intended to convey the persuasiveness of the kind and amount of evidence in favor of the particular conclusion in question compared with others. For scientific committees that seek to identify carcinogens, for example, researchers might be concerned with whether a substance is a human carcinogen. In such circumstances, scientists consider which rival conclusions are better supported by the weight of available evidence: Is the substance a human carcinogen; is it a probable human carcinogen; is the evidence so equivocal that one cannot decide; or is it not a human carcinogen at all? The implicit question to be addressed is whether the weight of the available scientific evidence better supports the claim that a substance causes (or contributes to), or more likely than not causes (or contributes to) cancer or to support some other claim. Scientists assessing the most likely cause of angiosarcoma in PVC plants concluded that the strongest explanation, which was quite good, was exposure to vinyl chloride monomers.[49]

15. It is clear that Austin Bradford Hill subscribed to inferences to the best explanation in his well-known paper, "The Environment and Disease: Association or Causation?" After providing nine considerations that would assist epidemiological and other researchers in coming to conclusions about

---

[42] Hill, "The Environment and Disease: Association or Causation?" See also Douglas Weed, "Underdetermination and Incommensurability in Contemporary Epidemiology," 7 *Kennedy Insti. Ethics* J. 107, 114 (1997).

[43] Hutchinson & Lane, at 12.

[44] National Toxicology Program, *11th Annual Report on Carcinogens*, p. 2 of Introduction; Cogliano, *et. al.*, "The Science and Practice of Carcinogen Identification and Evaluation," 1269, 1272.

[45] U.S. Environmental Protection Agency's Proposed Guidelines for Carcinogen Risk Assessment, 61 *Fed. Reg.*17, 960, 17,961 (Apr. 23, 1996) (to replace 51 Fed. Reg. 33992 when finalized).

[46] Wright, *Practical Reasoning*, at 49.

[47] David A. Eastmond, personal communication.

[48] Cogliano, *et. al.*, 1269, 1272 (emphasis added).

[49] Heath et. al.,

CRANOR000027

whether an observed association likely caused an observed disease he offers this summary of his view.

> Here then are nine different viewpoints from all of which we should study association before we cry causation. *What I do not believe – and this has been suggested – is that we can usefully lay down some hard-and-fast rules of evidence that must be obeyed before we accept cause and effect.* None of my nine viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and *none can be required as a sine qua non.* What they can do, *with greater or less strength,* is to help us to make up our minds on the fundamental question – *is there any other way of explaining the set of facts before us, is there any other answer equally, or more, likely than cause and effect?*[50] (emphasis and **bold** added)

Hill articulated considerations that he believed would assist finding the best explanation of an observed association between some exposure and disease and he recognized that a conclusion could have greater or less strength compared with alternative explanations of the observed disease.

16. Professor Martyn Smith utilizes Hill's considerations to assist him in inferring general causation and coming to a conclusion about which explanation the "weight of the evidence" supports concerning the causes of acute promyelocytic leukemia (or APL).[51] He correctly sees that Hill's general commitment to inference to the best explanation and good scientific methodology requires consideration of several kinds of evidence. These include: "human epidemiology studies, case reports, reviews describing a group of epidemiological studies, studies of effects of the exposure on animals, and a wide variety of experimental data – often conducted on intact animals, human cells *in vitro* and on model systems such as yeast, bacteria and mammalian cell lines -- showing the biological mechanisms through which the chemical may cause a disease, along with the metabolic pathways of the chemical in animals and humans."[52] He also "keeps in mind" Hill's specific considerations to assist his inference: 1) the strength of an association between an exposure and a particular disease, 2) consistency of the association across different researchers studying the problem in different circumstances at different times, 3) any specificity of the association (whether an exposure is associated with a unique or highly unusual disease, as asbestos is associated with mesothelioma), 4) temporality (the cause must precede the effect), 5) biological gradient or dose-response (is greater exposure associated with a greater disease rate), 6) the biological plausibility of an association (is the association biological plausible given existing scientific knowledge), 7) coherency of the association (is the association consistent with or does it conflict with what is known about the disease and its natural history), 8) any relevant experimental data (do any experimental data or semi-experimental data assist the inference for causation) and 9) analogy (do any biological analogies to other diseases or association assist the

---

[50] Hill, "The Environment and Disease," 19.
[51] Declaration of Martyn Smith, Paragraphs 19 and 20.
[52] Declaration of Martyn Smith, Paragraph 22.

CRANOR000028

inference for causation).[53] A few qualifications are important in understanding Hill's considerations. None of them is a necessary condition of coming to a causal judgment except number 4)—that a cause must precede its effect. Hill himself actually provides counterexamples to the necessity of each of 1-3, and 5-9, that is, showing that none of the other eight are necessary conditions of causal judgments. Moreover, Hill's factors are asymmetric. If they are present or applicable to the issue, he argues, they tend to strengthen the inference for causation, but if they are absent or inapplicable, they tend not to weaken it much (with the obvious exception of 4).

17. Based on my reading of Professor Smith's Declaration, Professor Smith has implicitly followed an inferential methodology that is deeply embedded in scientific inquiry (and other explanatory contexts): inference to the best explanation with additional assistance from Hill's considerations. In addition, Professor Smith assesses the plausibility of his conclusion that benzene can cause acute promyelocytic leukemia (APL) by means of what the "weight of the scientific evidence supports."[54] That is, he implicitly addresses the question of the best explanation for APL's association with benzene. He finds by the weight of the scientific evidence that benzene can cause APL is the best explanation;[55] this conclusion is supported by more of the scientific evidence than any alternative explanation. Alternative explanations, that appear to be implicit, are that benzene cannot cause APL, that benzene does not cause APL, and that when there is benzene exposure random chance does not explain the presence of APL in all of those who contract it. Based on his scientific judgment of several kinds of evidence and how he weighs it—epidemiological studies, case reports, animals studies, mechanistic studies and other experimental studies concerning chromosomal translocations typical of APL—he concludes that none of the alternative explanations is as well supported by the scientific evidence as the explanation that benzene exposure can cause APL.

## PROFESSOR SMITH'S INFERENCE TO THE BEST EXPLANATION THAT THE WEIGHT OF THE EVIDENCE SUPPORTS THE CLAIM THAT BENZENE EXPOSURE INDUCES ACUTE PROMYELOCYTIC LEUKEMIA

18. From a variety of case-control and cohort studies, benzene exposure is not only associated with AML, but also is associated with a specific species of AML, AML-M3 or acute promyelocytic leukemia (APL). A case-control study considers people that have AML or various species of AML, compares those without the disease(s) and seeks to find associations that might account for those with AML and its subspecies. Professor Smith cites a major "multi-center case-control study" that found an odds ratio for APL that was 1.42 or an increased risk of APL of 40% associated with benzene

---

[53] Declaration of Martyn Smith, Paragraph 22. Additional comments concerning Hill's considerations taken from Hill, "The Environment and Disease," 15-18.
[54] Declaration of Martyn Smith, Paragraph 19.
[55] Declaration of Martyn Smith, Paragraph 37.

CRANOR000029

exposure.[56] The odds ratio for APL was comparable to the odds ratio of several other species of AML. Smith also cites a large cohort study that "found 32 cases of acute leukemia." Researchers examined histopahtologic data for 9 exposed workers with AML and found that the most common species of AML was AML-M3 or APL.[57] A third case-control study from Italy found "a strong association with shoe-making" with an odds ratio of 6.3. Benzene was "used as an adhesive in shoemaking in both Italy and Turkey."[58] And a fourth found an excess of APL in a case control study from 1992. In addition, he references a case of APL from an epidemiological study at a Shell Oil plant and one from a Chinese study, as well as several case reports.

19. Since APL is a very rare disease, it is difficult for it to be detected by cohort studies (this is an endemic problem). (Cohort studies compare groups of people exposed to a possible disease-causing substance and then compare any adverse effects they contract with any adverse effects a non-exposed group contracts. It is typically difficult to utilize cohort studies to detect rare diseases.) However, the fact that a cohort study found APL in a group of AML's associated with benzene exposure, that several case-control studies found elevated risks of APL from benzene exposure and that different researchers in different circumstances at different times conducted these studies strengthens the argument that benzene causes APL. This evidence exemplifies two of Austin Bradford Hill's considerations: an elevated relative risk or odds ratio and the fact that there is consistency of findings from different researchers at different times in different circumstances (Hill considerations 1) and 2)). It also appears to exemplify Hill's consideration 7 that the data are consistent with the natural history of the disease (APL is a species of AML) and consideration 4 that exposure precedes the disease.

20. Moreover, as part of the background knowledge in toxicology, as indicated by two major researchers in a textbook and a review article, acute promyelocytic leukemia has been recognized as associated with benzene exposure for some time.[59] APL, Smith notes, has been identified since 1957.

21. The epidemiologic data show that APL is associated with benzene exposure and several studies show an elevated relative risk, one quite substantial. Thus, this data casts considerable doubt on three rival explanations: that benzene exposure cannot cause APL, that benzene exposure is not associated with APL and that APL is a matter of chance when those with the disease have benzene exposure. It also increases the plausibility that benzene exposure causes APL according to Hill's considerations 1) and 2).

22. Professor Smith does not stop with the epidemiological evidence, but goes on to consider the biological plausibility (Hill's factor 6) of the epidemiological evidence, by finding and generating experimental mechanistic evidence (Hill's factor 8) to see whether and the extent to which it

---

[56] Declaration of Martyn Smith, Paragraph 25a.
[57] Declaration of Martyn Smith, Paragraph 25b.
[58] Declaration of Martyn Smith, Paragraph 25e.
[59] Declaration of Martyn Smith, Paragraph 27.

CRANOR000030

strengthens the case for a causal relationship. In considering the experimental mechanistic evidence he also draws on biological analogies to other substances that cause APL (Hill's factor 9).

23. APL has a characteristic chromosomal translocation between chromosomes 15 and 17 (call it t(15;17) following his symbolism).[60] Benzene is a clastogen (causes chromosomal breakage) and chromosomal breakage is more common among leukemia cases associated with benzene exposure than leukemia cases arising from the general population.[61] Thus, he argues that it is biologically plausible that benzene causes the chromosomal break leading to the translocation of chromosomes 15 and 17.

24. He supplements the point that benzene causes the chromosomal break by showing that there is biologically plausible mechanistic evidence that offers an explanation of what likely occurs when people are exposed to benzene.

A) Topoisomerase II is an enzyme that assists in maintaining proper chromosome structure and segregation as well as helping to preserve the integrity of DNA during replication. Ordinarily, Topoisomerase II co-valent complexes with DNA termini are fleeting and tolerated by the cell. When they exist longer, they tend to cause DNA strand breaks and other genomic events.[62]

B) Several anti-cancer drugs target the enzyme Topoisomerase II and "poison" it resulting in cell death. These same anti-cancer drugs produce the t(15;17) translocation and APL results.[63] APL appears to be a not uncommon disease following certain anti-cancer therapies that cause the t(15;17) translocation.

C) The current best mechanistic evidence for benzene toxicity, according to Professor Smith, is that benzene is metabolized into 1,4-hydroquinone that is "ultimately is converted to 1,4-benzoquinone" in the bone marrow.[64] Moreover, these reactive benzene metabolites—1,4-hydroquinone and 1,4-benzoquinone—appear to "inhibit the functionality of topoisomerase II,"[65] "enhance DNA cleavage mediated by human Topoisomerase II,"[66] and are Topoisomerase II poisons.[67]

D) Drawing on the biological analogy with anti-cancer drug studies that show that Topoisomerase II poisons "cause AML [and] induce chromosomal translocations associated with APL,"[68] he argues that "since metabolites of benzene have been shown to be Topoisomerase inhibitors and poisons, there is strong mechanistic evidence for a causal relationship between exposure to benzene, which . . . produces reactive metabolites which induce APL … ."[69]

25. Consequently, as I understand the overall argument Professor Smith finds a) that there is an

[60] Declaration of Martyn Smith, Paragraph 28 b. and Paragraph 31.
[61] Declaration of Martyn Smith, Paragraph 28 b.
[62] Declaration of Martyn Smith, Paragraph 29.
[63] Declaration of Martyn Smith, Paragraph 31 and 32.
[64] Declaration of Martyn Smith, Paragraph 34.
[65] Declaration of Martyn Smith, Paragraph 34.
[66] Declaration of Martyn Smith, Paragraph 35.
[67] Declaration of Martyn Smith, Paragraph 36.
[68] Declaration of Martyn Smith, Paragraph 36.

CRANOR000031

elevated risk of APL from benzene exposure shown by several epidemiological studies conducted by several different investigators in different circumstances and at different times (supported by case reports and background knowledge from the literature) (Hill's factors 1) and 2)); b) this data appears consistent with nature of the disease (Hill's factor 7); and c) there is biological plausibility to the benzene-APL association (Hill's factor 6), because d) there is experimental mechanistic evidence that benzene is converted into metabolites that inhibit and poison Topoisomerase II likely causing the t(15;17) chromosomal translocation that is characteristic of a high percentage of cases of APL. Biological plausibility (Hill's factor 6) is based on the mechanistic data from experimental studies (Hill's consideration 8) and supported by analogies with anti-cancer drugs that also poison Topoisomerase II and cause APL (Hill's consideration 9). Thus, as he puts it "there is strong biological and mechanistic evidence that exposure to benzene causes APL with its associated chromosome translocations involving the retinoic acid receptor-alpha (*RARa*) gene on Chromosome 17."[69]

28. Professor Smith has offered an argument to the best explanation that the weight of the scientific evidence supports the conclusion that benzene exposure can cause APL and likely causes it by means of its metabolites inhibiting or poisoning a critical enzyme resulting in chromosomal translocations that are strongly associated with APL. This argument is supported by epidemiologic studies showing elevated risks of APL from benzene exposure conducted by different investigators in different circumstances at different times as well as case reports and background knowledge from the literature. In this he has in effect utilized Hill's considerations 1) and 2). The epidemiological evidence also exemplifies consistency with the history of the disease (Hill's factor 7) and that exposure precedes the disease (Hill's factor 4). He supplements his argument by showing that it is biologically plausible (Hill's consideration 6) utilizing experimental mechanistic studies (Hill's factor 8) that metabolites of benzene likely cause critical enzyme inhibition or death that leads to chromosomal translocations t(15;17) that are typical of APL. The poisoning of the enzyme Topoisomerase II is biologically quite analogous to anti-cancer drug poisoning of the same enzyme that causes APL (Hill's factor 9). Professor Smith had to utilize his scientific judgment in finding relevant scientific studies, conducting appropriate research to better answer some of the questions about the association between benzene exposure and APL, assimilating and integrating the evidence and coming to his overall scientific conclusion that the "weight of the evidence evaluation of all of the available and relevant scientific evidence allows me to conclude to a reasonable degree of scientific probability, that occupational exposure to benzene can cause acute promyelocytic leukemia."[71] In his analysis of the relation between benzene exposure and APL he has followed a standard inferential methodology that is central to and

---

[69] Declaration of Martyn Smith, Paragraph 36.
[70] Declaration of Martyn Smith, Paragraph 36.
[71] Declaration of Martyn Smith, Paragraph 37.

CRANOR000032

deeply embedded in science and in many other nondeductive inferential and explanatory activities.

29. I have based my opinion on my experience, philosophic training, knowledge, and the literature regarding inferences to the best explanation as well as reviewing Professor Smith's declaration. I reserve the right to modify or supplement my opinion if additional information becomes available.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed October 9, 2008, at Riverside, California.


*Carl F. Cranor*

Carl F. Cranor

CRANOR000033