### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **BRIAN K. MILWARD AND LINDA J. MILWARD**<br><br>  **PLAINTIFFS,**<br><br>  -V-<br><br>**ACUITY SPECIALTY PRODUCTS GROUP, INC.; AGS COMPANY; ARISTECH CHEMICAL CORPORATION; BERRYMAN PRODUCTS, INC.; BOSTICK, INC.; BOYLE –MIDWAY, INC.; THE CLOROX COMPANY; CRC INDUSTRIES, INC.; HENKEL CORPORATION; LA-CO INDUSTRIES, INC./MARKAL; LPS INDUSTRIES, INC.; NCH CORPORATION, CHEMSEARCH DIVISION; NICUS CORPORATION; NU-CALGON WHOLESALER, INC.; RADIATOR SPECIALTY COMPANY; RUST-O-LEUM CORPORATION; SHERWINWILLIAMS COMPANY; THE STECOCORPORATION; SUNNYSIDE CORPORATION; SUNOCO, INC.; UNITED STATES STEEL CORPORATION; USX CORPORATION; WD-40 COMPANY; AND ZEP MANUFACTURING COMPANY,**<br><br>  **DEFENDANTS.** | **NO.: 1:07CV11944**<br><br><br>**LEAVE TO FILE GRANTED**<br>**ON MARCH 30, 2009** |

## DEFENDANTS' *DAUBERT* SUBMISSION IN OPPOSITION
## TO PLAINTIFFS' PROFFERED EXPERTS

### INTRODUCTION

Plaintiff Brian K. Milward has been diagnosed with a form of leukemia

known as acute promyelocytic leukemia ("APL"), with a chromosomal translocation known as

t(15;17) and plaintiffs contend that Mr. Milward's APL was caused by his alleged exposure to

the chemical benzene and/or to benzene contaminants allegedly present in defendants' products.

The "general causation" question presently before the Court is whether, pursuant to and in accordance with Federal Rules of Evidence, Rule 702, there is sufficient scientific or medical evidence to allow an expert to testify that exposure to benzene *at any level* is capable of causing APL.

Plaintiffs' scientific expert, Dr. Martyn Smith, seeks to opine that exposure to benzene causes acute myelogenous leukemia ("AML") and that, because APL is a sub-type of AML, there is a sufficient scientific basis from which to conclude that exposure to benzene causes APL. *See* Supplemental Declaration of Martyn Smith, attached to the Deposition of Martyn Smith ("Smith Dep."), Dep. Exhibit 2, pp. 694 – 698 and attached hereto as Ex. 1.  AML, however, is not a single disease, but, rather, a collection of similar albeit distinct sub-type diseases; and, although APL is a sub-type of AML, it has unique characteristics which distinguish it from other sub-types of AML.  Thus, notwithstanding that defendants' experts generally agree that exposure to sufficient doses of benzene may cause certain subtypes of AML, they have nonetheless opined that there is no scientifically valid support whatsoever for the conclusion that benzene exposure can cause APL, which is the lone sub-type of leukemia at issue in this lawsuit.  As discussed below, Dr. Smith's own testimony shows that he employed a flawed methodology in attempting to support his litigation-driven conclusion, *i.e.*, beginning his analysis with the conclusion that benzene causes APL, and then working backwards to find support for his proposition. Carefully examined, Dr. Smith's conclusion is nothing more than an *ipse dixit* pronouncement based upon his status.

Defendants' experts, in contrast, analyze the issue and reach their conclusions by following the traditional elements of the scientific method.  They do not start with a conclusion and then try to "pigeon hole" the available scientific literature – or, worse, ignore the results in

certain literature entirely – to fit a predetermined result.  Rather, they employ a sound, generally-accepted methodology that begins by asking the very question before this Court: Is there sufficient scientific evidence from which an expert can reliably conclude that exposure to benzene at any level is capable of causing APL?  After reviewing all of the available evidence, defendants' experts conclude unequivocally that there is no such scientific basis upon which to support an opinion that benzene causes APL.  Consequently, Dr. Smith's testimony is not admissible in front of a jury, and should be excluded from evidence by this Court.

Plaintiffs' second proffered expert, Dr. Carl Cranor, is not a scientist; he is a philosophy professor at a university who writes, *inter alia*, about legal issues that interest him.  He offers no scientific evidence whatsoever with respect to the "general causation" issue before this Court. Plaintiffs have proffered Dr. Cranor *solely* for the purpose of this *Daubert* inquiry – *i.e.*, plaintiffs do *not* intend to have Dr. Cranor testify at trial – and *solely* for the purpose of stating that Dr. Smith's opinions are based upon what he considers "a well recognized form of argument that has widespread application … with respect to determining an explanation for adverse health effects."  *See* Deposition of Carl Cranor ("Cranor Dep."), with exhibits, p. 55, and attached hereto as Exhibit 2.  Dr. Cranor proposes "such form of argument" should supplant the legal requirements for admissibility of expert testimony that are set forth in Federal Rules of Evidence, Rule 702 and that have been defined by the Supreme Court and by the First Circuit.   In short, plaintiffs proffer Dr. Cranor solely for his musings regarding the legal standards that he feels should be applicable in this case under the guise of presenting them to the Court as "expert opinion".

I.       **THE *DAUBERT* ISSUE BEFORE THE COURT**

A. **What is Benzene?**

Benzene is a colorless liquid with a sweet odor.  *Toxicological Profile for Benzene,* U.S. Department of Health and Human Services (August 2007), p. 1.  Benzene is one of many chemicals referred to as "aromatic hydrocarbons", and benzene is given the chemical designation $C_6H_6$, meaning that it is composed of six carbon molecules and six hydrogen molecules.

Benzene was discovered in 1825, when English chemist and physicist Michael Faraday isolated benzene from a liquid condensed by compressing oil gas.  *Id.*, at 243.  The first major industrial use of benzene "was as a solvent in the rubber industry just preceding World War I." *Occupational Exposure to Benzene, Final Rule* (September 11, 1987), Occupational Safety and Health Administration, Federal Register, Vol. 52, No. 178, at p. 34467.

Benzene is a naturally occurring substance found in the air we breathe, the water we drink, and some of the food we eat. It is found naturally in the earth's crust and is *ubiquitous*. According to one of the most widely regarded authorities on the subject, benzene is in such diverse foods as eggs, beef, chicken, potatoes, Jamaican rum, fish, and peanuts. International Agency for the Research of Cancer (IARC)[1], MONOGRAPH ON BENZENE (1981)[2]; *see also Toxicological Profile for Benzene,* U.S. Department of Health and Human Services (August 2007), pp. 271-272.[3]

---

[1] IARC is part of the World Health Organization which has as its mission to coordinate and conduct research on the causes of human cancer, the mechanisms of carcinogenesis, and to develop scientific strategies for cancer control. The Agency is involved in both epidemiological and laboratory research and disseminates scientific information through publications, meetings, courses, and fellowships.  *See* International Agency for Research on Cancer Home Page, http://www.iarc.fr (last visited March 26, 2009).

[2] monographs.iarc.fr/ENG/monographs/vol29/volume29.pdf (last visited March 30, 2009)

[3]  The U.S. Food and Drug Administration sponsored a 5-year study to determine the amount of volatile organics in food from 1996 to 2000. Benzene was found in cheddar cheese, cream cheese, margarine, butter, sour cream, ground beef, bologna, hamburger, cheeseburger, pork, beef frankfurters, tuna canned in oil, chicken nuggets,

Benzene is an important commodity product and is used to form other chemicals, which, in turn, are used to create many things taken for granted in today's society.  The Agency for Toxic Substances and Disease Registry ("ATSDR")[4] described benzene as follows:

> Benzene is widely used in the United States; it ranks in the top 20 chemicals for production volume. Some industries use benzene to make other chemicals which are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of rubbers, lubricants, dyes, detergents, drugs, and pesticides. Natural sources of benzene include volcanoes and forest fires. Benzene is also a natural part of crude oil, gasoline, and cigarette smoke.[5]

Benzene has been, and continues to be, one of the most produced chemicals in the United States.  Since 1959, the major U.S. source of benzene production has been petroleum.  *National Toxicology Program, Report on Carcinogens, Benzene, Eleventh Edition*[6].  U.S. production of benzene increased from 12 billion pounds in 1992 to 15.8 billion pounds in 2002, an average annual increase of 2.8 percent.  *Id.*  Benzene ranks in the top 20 most abundantly produced chemicals in the United States and, in 2004; over 2,500 facilities in the United States produced or

---

chocolate cake icing, sandwich cookie, chocolate chip cookies, graham crackers, sugar cookies, cake doughnuts with icing, french fries, apple pie, cola carbonated beverages, sweet roll Danish, potato chips, cheese pizza, cheese and pepperoni pizza, mixed nuts, fruit-flavored cereal, fruit flavored sorbet, popsicles, olive/safflower oil, scrambled eggs, peanut butter, popcorn popped in oil, blueberry muffins, coleslaw with dressing, raw banana, avocado, oranges, and strawberries. American cheese was the only food tested that did not contain benzene. Foods with the greatest maximum concentration of benzene included ground beef (maximum 190 ppb), raw bananas (maximum 132 ppb), carbonated cola (maximum 138 ppb), and coleslaw with dressing (maximum 102 ppb).  *Toxicological Profile for Benzene,* U.S. Department of Health and Human Services (August 2007), pp. 271-272. http://www.atsdr.cdc.gov/toxprofiles/tp3.html (last visited on march 30, 2009).

[4]  ATSDR is an agency of the U.S. Department of Health and Human Services.  ATSDR is directed by congressional mandate to perform specific functions concerning the effect on public health of hazardous substances in the environment.  *See* www.atsdr.cdc.gov (last visited March 30, 2009).

[5]  *See* ATSDR "ToxFAQs" for benzene.  The ATSDR ToxFAQs[TM] is a series of summaries about hazardous substances developed by the ATSDR Division of Toxicology.  www.atsdr.cdc.gov/tfacts3.html (last visited March 30, 2009).

[6]  ntp.niehs.nih.gov/ntp/roc/eleventh/profiles/s019benz.pdf (last visited March 30, 2009).

processed benzene.  *Toxicological Profile for Benzene,* U.S. Department of Health and Human

Services (August 2007), p. 244.

"Auto exhaust and industrial emissions account for 20 percent of the total nationwide

exposure to benzene.  About 50 percent of the entire nationwide exposure to benzene results

from smoking tobacco or from exposure to tobacco smoke."  U.S. Dep't of Health and Human

Servs., *Toxicological Profile for Benzene* 1.3 (1993)[7].  *See also* The National Institutes of Health

*Report on Carcinogens, Eleventh Edition, Benzene* ("[a]pproximately half of the total national

exposure to benzene comes from cigarette smoke"); *see also Toxicological Profile for Benzene,*

U.S. Department of Health and Human Services (August 2007), p. 283 ("The major source of

exposure to benzene is cigarette smoke").  Moreover, among smokers, 90 percent of benzene

exposure comes from smoking.[8]

### B. <u>APL Is a Unique Disease</u>

#### 1. <u>Leukemia in General</u>

In order to understand more fully the unique nature of APL, a general understanding of

the body's formation of blood cells and an overview of leukemia is required.  Normal bone

marrow uses a process called hematopoiesis to produce red blood cells, white blood cells and

platelets.  *Sutera v. Perrier,* 986 F. Supp. 655, 658 (D. Mass. 1997).  "Normal hematopoieses

begins with a 'pluripotent' stem cell which divides into lymphoid and myeloid cells."  *Id.*

Leukemia is a malignant disease of the bone marrow and blood.  Leukemia involves "a

malignant mutation of stem cells in the bone marrow; accordingly, the disease is sometimes

referred to as a hematologic (blood-forming) malignancy."  *Id.*

---

[7] http://www.atsdr.cdc.gov/toxprofiles/tp3-c6.pdf (last visited on March 30, 2009).

[8] 2004 *Surgeon General's Report—TheHealth Consequences of Smoking,* Chapter 2, pp. 252-254, http://www.cdc.gov/tobacco/data_statistics/sgr/sgr_2004/00_pdfs/chapter2.pdf (last visited March 26, 2009).

Leukemia is divided into four categories: myelogenous or lymphocytic, each of which can be acute or chronic. The terms myelogenous or lymphocytic denote the blood cell type involved.  The disease is first classified depending on which of these two sets of cells become malignant, and then more specifically by the particular cell subtype.  Combining these classification attributes has resulted in four major disease-types called:

1.    Acute Myelogenous Leukemia (AML);

2.    Acute Lymphocytic Leukemia (ALL);

3.    Chronic Myelogenous Leukemia (CML);  and

4.    Chronic Lymphocytic Leukemia (CLL).

*See generally*, The Leukemia and Lymphoma Society's website.[9]

## 2. Acute Myelogenous Leukemia

AML itself is not one disease but, instead, is a collection of at least eight different and unique types of leukemia.  *See* Declaration of Dr. Martyn Smith ("Smith Declaration"), ¶ 14, attached as Ex 1 to Smith Dep.; *See* Report of Dr. David Pyatt ("Pyatt Report"), ¶ 11, attached hereto as Exhibit 3.   Historically, these types of leukemia have been categorized within eight sub-types (M0-M7) of AML, and have been classified pursuant to the French-American-British ("FAB") system as follows:

---

[9]  According to the Leukemia and Lymphoma Society:

> The terms lymphocytic or lymphoblastic indicate that the cancerous change takes place in a type of marrow cell that forms lymphocytes. The terms myelogenous or myeloid indicate that the cell change takes place in a type of marrow cell that normally goes on to form red cells, some types of white cells, and platelets.

> Acute lymphocytic leukemia and acute myelogenous leukemia are each composed of blast cells, known as lymphoblasts or myeloblasts. Acute leukemias progress rapidly without treatment.

> Chronic leukemias have few or no blast cells. Chronic lymphocytic leukemia and chronic myelogenous leukemia usually progress slowly compared to acute leukemias.

http://www.leukemia-lymphoma.org/all_page?item_id=7026 (last visited March 26, 2009).

- M0     Myeloblastic, on special analysis

- M1     Myeloblastic, without maturation

- M2     Myeloblastic, with maturation

- M3     Promyeloctic

- M4     Myelomonocytic

- M5     Monocytic

- M6     Erythroleukemia

- M7     Megakaryocytic

Moreover, and as noted by the Leukemia and Lymphoma Society and the National Cancer Institute ("NCI"), the AML collection of leukemia is the most commonly diagnosed leukemia, "with an estimated 13,290 new cases [in 2008]."[10]  "There will be an estimated 8,820 deaths from acute myelogenous leukemia [in 2008]. . ."[11]  *See also* Smith Declaration, ¶ 17. According to NCI, 1 in 272 men and women will be diagnosed with an AML sub-type leukemia during their lifetime.[12]

Most cases of AML are, in fact, *idiopathic,* or of unknown origin.  *Sutera,* 986 F. Supp. at 659, and Dr. Smith has acknowledged that "80 percent" of AML-type cases are of an unknown etiology.  *See* Smith Dep., p. 64.  Indeed, according to the Leukemia and Lymphoma Society, "[t]he cause of leukemia is not known."[13]  Although the cause of most cases, and certain sub-

---

[10] http://www.leukemia-lymphoma.org/all_page?item_id=8459 (last visited March 26, 2009).

[11] http://www.leukemia-lymphoma.org/all_page?item_id=9346#_new_cases (last visited March 26, 2009); National Cancer Institute: Acute Myeloid Leukemia, http://seer.cancer.gov/statfacts/html/amyl.html (last visited March 26, 2009)..

[12] National Cancer Institute: Acute Myeloid Leukemia, http://seer.cancer.gov/statfacts/html/amyl.html (last visited March 26, 2009)..

[13] http://www.leukemia-lymphoma.org/all_page?item_id=7026 (last visited March 26, 2009).

types, of AML is unknown, epidemiological studies have identified certain substances which may cause certain subtypes of AML.  "Chronic exposure to benzene in the workplace **that exceeds federally approved safety limits**" and exposure to extraordinary doses of radiation can be causes of the disease, "**although neither explains most cases**." *See* The Leukemia & Lymphoma Society, "Leukemia Facts & Statistics"(emphasis added).[14]  Risk factors associated with AML sub-types are "some types of chemotherapy, radiation therapy used to treat other cancers, tobacco smoke, and exposure to large amounts of benzene.  Most people who have these risk factors do *not* get AML - and most people with AML do not have these risk factors."[15]

One issue on which experts on both sides of this lawsuit can agree, however, is that exposure to sufficient levels of benzene over long periods of time can cause certain sub-types of AML.  As discussed at length below, there are numerous statistically significant epidemiological studies of workers exposed to benzene who have developed various sub-types of AML, *other than* APL.  *See* Part IV, *infra*.  Conversely, none of the epidemiological literature reveals statistically significant studies that have shown documented benzene-exposed workers developing APL, which is the only sub-type of AML relevant to this case.

Dr. Smith conceded as much in his deposition, testifying:

14 Q.   Doctor, when we began this morning, you said
15       that you hold the opinion that exposure to benzene
16       causes APL; is that correct?

17 A.   Yes.

18 Q.   And you come to that conclusion without any
19       epidemiological studies that show a causal relationship
20       or statistically significant causal relationship between

---

[14] http://www.leukemia-lymphoma.org/all_page?item_id=9346#_new_cases (last visited March 26, 2009)(emphasis added); http://www.leukemia-lymphoma.org/all_page?item_id=7026 (last visited March 26, 2009)(emphasis added).

[15] http://www.leukemia-lymphoma.org/all_page?item_id=8459 (last visited March 26, 2009)(emphasis added)..

21      benzene exposure and APL, is that correct?

22      MR. JENSEN: Objection to the form.

23      THE WITNESS:  **Yes**.  I mean, **there are no**
24      **specific studies of APL and benzene exposure that I can**
25      **rely on**, and therefore, I must, in order to reach that
1       conclusion, form an argument or a basis or a scientific
2       judgment based on a methodology of going through
3       biological plausibility and some of the other factors.

*See* Smith Dep., pp. 107-108 (emphasis added).

### 3. <u>APL</u>

As previously discussed, Mr. Milward has been diagnosed with a relatively unique sub-type of AML, known as "APL" or AML sub-type M3.  "APL is an extremely rare form of <u>leukemia</u> that comprises a small percentage of the overall incidence of AMLs - only ten percent of all <u>acute myeloid leukemias</u> are categorized as APL."  *Sutera,* 986 F. Supp. at 659.  *See also Williams* Hematology, 7th Ed., p. 1192 (APL accounts for approximately 10% of AML cases.)  Dr. Smith himself states that APL "accounts for 5-10% of cases of AML."  *See* Smith Declaration, ¶ 17.

The relatively unique nature of APL among other AMLs is underscored by the Leukemia and Lymphoma Society's following notation of "Treating Special AML Subtypes":

**Acute Promyelocytic Leukemia Treatment**

Acute promyelocytic leukemia is the most curable form of AML.  People with acute promyelocytic leukemia are treated with a substance that comes from Vitamin A called all-transretinoic acid (ATRA).  This treatment is given along with chemotherapy.  It is often successful in bringing this type of leukemia into remission.  Another treatment for acute promyelocytic leukemia is arsenic trioxide (ATO).  It may be given to patients whose leukemia has returned or cannot be brought under control with chemotherapy and ATRA[16]

---

[16]<u>http://www.leukemia-lymphoma.org/all_page?item_id=8459</u>(last visited March 26, 2009).

Dr. Smith argues that, because exposure to benzene at sufficiently high doses over long periods of time is one of the known risk factors for certain sub-types of AML, APL therefore must also be caused by benzene.[17]  Furthermore, plaintiffs assert that defendants have lost sight of the "forest" of scientific evidence supporting the association between benzene exposure and AML by focusing on individual "trees", *i.e.*, that defendants have improperly focused on the results of scientific studies that have found no link between benzene exposure and APL. Plaintiffs' analogy to "trees" and "forests" only underscores the disingenuous nature of plaintiffs' and Dr. Smith's attempts to obscure the scientific evidence that relates to APL. Plaintiffs seek to lump that evidence with the "forest" of evidence pertaining to the more generic studies relating to other AML sub-types, apparently in the hopes that the Court will lose sight of the relatively unique nature and characteristics of APL among the other AML "trees".

However, plaintiffs' "trees and forest" analogy ignores the fact that this Court has already recognized how significantly APL differs from other sub-types of AML, both in terms of its characteristic appearance and in terms of its treatment.  "APL is an early stem cell mutation that affects granulocyte blood cells.  It is characterized by prominent granules in immature cells, not seen in other AMLs, and by a unique translocation that takes place between chromosomes 15 and 17."  *Sutera,* 986 F. Supp. at 659.  *See also* Smith Declaration, ¶ 18; Pyatt Report, ¶ 11.

Finally, Dr. Smith has himself acknowledged these important distinctions between APL and other AML sub-types.  He has admitted that APL is a "unique therapeutic entity among the myeloid leukemias."  *See* Smith Supplemental Declaration, ¶ 2.  He further admitted that the reason for the relative effectiveness of treatment for APL is as follows:

---

[17] Benzene is not a known risk factor for other forms of leukemia.  *See* IARC's Monograph on Benzene, Vol. 29 (The relationship between benzene exposure and acute myelogenous leukemia has been established in epidemiologic studies.  Reports linking benzene exposure to other malignancies were considered to be inadequate for evaluation.") http://monographs.iarc.fr/ENG/Monographs/vol29/volume29.pdf (last visited March 26, 2009).

16 Q.   And in fact, with APL, with the translocation
17        at 15;17, there is a very effective therapy for treating
18        that, correct?

19 A.   Yes, because of that unique translocation.

*See* Smith Dep., p. 106.

## II.      STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

### A. General Principles Applicable To Expert Testimony

Under Rule 702 of the Federal Rules of Evidence, a District Court Judge must act as a gatekeeper "to ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993).  *See also*; *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir.2002).  This role is of critical importance, because courts "must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'"  *Daubert*, 509 U.S. at 595.  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999); *United States v. Unumprovident Corp.*, No. 03-11699-PBS, 2009 WL 530575, at *6 (D.Mass., Feb. 24, 2009); *United States v. Hines*, 55 F.Supp.2d 62, 64 (D.Mass.1999).   This is especially true in cases where a "plaintiff claims that exposure to a toxic substance caused his injury, [because a] jury may blindly accept an expert's opinion that conforms with their underlying fear of toxic substances without carefully understanding or examining the basis for the opinion."  *Sutera v. The Perrier Group of America*, 986 F.Supp. 655, 660 (D.Mass.1997), citing *Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 24 (D. Mass. 1995), quoting *O'Connor v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1391 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994).

Recently, this Court described its "gatekeeper" function as follows:

In sum, a district judge performing the "gatekeeper" function required by Rule 702 of the Federal Rules of Evidence asks three preliminary questions:

First, is this junk science?  The *Daubert* analysis ought to resolve this question.

Second, is this a junk scientist?  As a routine matter, this Court asks whether the opinion the proffered expert seeks to give in the case at bar is one that society – outside the litigation process – seeks from this individual as it goes about its daily living.  If the science itself is reliable and society seeks comparable opinions from this individual, the Court asks,

Third, is this a junk opinion?  In other words, as Justice Breyer expressed it in *Kumho Tire*, is the proffered opinion "adequate to the task at hand."  *Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167.  *See also Joiner*, 522 U.S. at 146, 118 S.Ct. 512.

*McGovern* v. *Brigham & Women's Hospital*, 584 F.Supp.2d 418, 424 (D.Mass. 2008).

As gatekeeper, the District Court Judge must conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.  *See also Crowe v. Marchand*, 506 F.3d 13, 17 (1st Cir. 2007) (Rule 702 requires that expert opinion testimony rest on "sufficient facts or data" and must reflect the use of "reliable principles and methods" appropriate to the expert's field); *Unumprovident Corp.* 2009 WL 530575, at *6, quoting *Ruiz-Troche v. Pepsi-Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("expert's conclusion must be arrived at in a scientifically sound and methodologically reliable fashion.").  The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of proof.  *See Daubert*, 509 U.S. at 592 n.10.

Under Rule 702, the Court must first consider whether the proposed expert is qualified as an expert by "knowledge, skill, experience, training or education." *See* Fed. R. Evid., Rule 702. A proposed expert who is not qualified under the requirements of Rule 702 cannot testify as an expert at trial. *See Sutera*, 986 F.Supp. at 662. The decision regarding qualifications is committed to the sound discretion of the District Court Judge. *Whiting*, 891 F. Supp. at 24. If the proposed expert is deemed to be qualified to offer an opinion, the District Court Judge must then determine that:

1)      the expert's testimony is reliable (*i.e.*, "based on the methods and procedures of science rather than on a subjective belief or unsupported speculation"); and

2)      there is a nexus between the expert's testimony and the facts of the case.

*Sutera*, 986 F.Supp. at 661. S*ee also Kumho Tire Co.*, 526 U.S. at 141.

To determine if the proposed testimony is both relevant and reliable, the District Court Judge must focus on the "principles and methodology" used by the expert to reach his or her conclusions. *See Daubert*, 509 U.S. at 594-96. Factors that the District Court Judge may consider include:

- Whether the expert's methodology has been or could have been tested;

- Whether the expert's methodology has been subject to peer review and publication;

- The known or potential rate of error for the methodology utilized; and

- The level of acceptance of the reasoning or methodology in the relevant scientific or professional community.

*See Kumho Tire Co.*, 526 U.S. at 149-150; *Daubert*, 509 U.S. at 593-94.

The objective of this analysis is to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. "The focus, of course, must be solely on principles and methodology." *Daubert*, 509 U.S. at 595. *See also General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."); *Ruiz-Troche*, 161 F.3d at 77 ("methodology remains the central focus of a *Daubert* inquiry"); S*mith v. General Elec. Co.*, 2004 WL 870832, at *4 (D. Mass. 2004) (*Daubert* demands that an expert's conclusion be arrived at "in a scientifically sound and methodologically reliable fashion.").

In assessing an expert's methodology, the District Court Judge should also consider whether the expert employed and satisfied the Bradford Hill factors in formulating his opinion. *See Gannon v. United States*, 292 Fed.Appx. 170, 173 (3rd Cir, 2008); *Whitfield v. Tronox Worldwide LLC*, No. 1:03CVV287-D-D, 2007 WL 2127298, at *3 (N.D.Miss., July 23, 2007). The nine (9) Bradford Hill factors are "broadly accepted criteria for evaluating causation that have been developed by scientists" and are "widely used in the scientific community to assess general causation." *Id.* at n. 1[18]. These factors include whether a temporal relationship exists between the subject exposure and the disease; the strength of the association; the dose-response relationship; replication of the findings; biological plausibility; consideration of alternative explanations; cessation of exposure; specificity of the association; and consistency with other knowledge. *Id.  See also* Federal Judicial Center, *Reference Manual on Scientific Evidence*, 2nd

----

[18]A. Bradford Hill, Ltd., *The Environment and Disease:  Association or Causation?*  58 Proc. Royal Soc'y Med. 295 (1965), http://www.pubmedcentral.nih.gov/picrender.fcgi?artid=1898525&blobtype=pdf, (last visited on March 30, 2009).

Ed. (2000) ("*Reference Manual on Scientific Evidence*"), at 375F. Plaintiffs can not show that Dr. Smith's methodology meets the essential prerequisites of science to demonstrate a cause and effect relationship.

## B. Epidemiology is Necessary to Establish Causation

Epidemiological studies are defined as the branch of medicine that deals with the causes, distribution, and control of disease in humans.  Epidemiological studies, therefore, are necessary to determine the cause and effect relationship between an agent and a disease.  Indeed, "[i]t is accepted that, in evaluating a purported causal link between a chemical agent and a particular disease, epidemiological studies are the most informative."  *Castellow v. Chevron U.S.A.*, 97 F. Supp. 2d 780, 786 (S.D. Tex. 2000), citing *Allen,* 102 F.3d at 196.  In determining whether a toxin or agent can cause a specific disease, epidemiological studies are the generally accepted method.  *See Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 196 (5th Cir. 1996) ("the most useful and conclusive type of evidence in [toxic tort cases] is epidemiologic studies.").  *See also Sutera*, 986 F.Supp. at 663 (granting defendant's motion for summary judgment where plaintiffs' expert was unable to produce peer-reviewed epidemiological studies that associated benzene with APL from which plaintiff suffered).

The purpose of epidemiology is to understand better disease causation and to prevent disease in groups of individuals.  Epidemiology assumes that disease is not distributed randomly in groups of individuals and that identifiable subgroups, including those exposed to certain agents, are at increased risk of contracting particular diseases."  Federal Judicial Center, *Reference Manual on Scientific Evidence*, 2nd Ed. (2000), at 335.  As explained by the Federal Judicial Center:

The factors that guide epidemiologists in making judgments about causation are:

1.      temporal relationship;

2.      strength of association;

3.      dose-response relationship;

4.      replication of the findings;

5.      biological plausibility (coherence with existing knowledge);

6.      consideration of alternative explanations;

7.      causation of exposure;

8.      specificity of association; and

9.      consistency with other knowledge

Epidemiologists use causation to mean that an increase in the incidence of disease among the exposed subjects would not have occurred had they not been exposed to the agent. In accessing causation, researchers first look for alternative explanations for the **association**[19], such as bias or

---

[19] The *Reference Manual on Scientific Evidence* provides straight forward definitions of association *p*-value, confidence interval and statistical significance that are generally accepted by the scientific community. As the definitions of these important concepts demonstrate, they are the bases for understanding whether there is an association or causal relationship between an exposure to a toxic agent and a particular disease. They are as follows:

**association**. The degree of statistical relationship between two or more events or variables. Events are said to be associated when they occur more or less frequently than one would expect by chance. Association does not necessarily imply a causal relationship. Events are said not to have an association when the agent (or independent variable) has no apparent effect on the incidence of a disease (the dependent variable). This corresponds to a relative risk of 1.0. A negative association means that the events occur less frequently together than one would expect by chance, thereby implying a preventive or protective role for the agent (e.g., a vaccine).

*p*(**probability**), *p*-**value**. The *p*-value is the probability of getting a value of the test outcome equal to or more extreme that the result observed, given that the null hypothesis is true. The letter *p*, followed by the abbreviation "n.s." (not significant) means that $p > .05$ and that the association was not statistically significant at the .05 level of significance. The statement "$p < 0.5$" means that p is less than 5%, and, by convention, the result is deemed statistically significant. Other significance levels can be adopted, such as .01 or .1. The lower the *p*-value, the less likely that random error would have produced the observed relative risk if the true relative risk is 1.

**confidence interval**. A range of values calculated from the results of a study within which the true value is likely to fall; the width of the interval reflects random error. Thus, if a confidence level of .95 is selected for a study, 95% of similar studies would result in the true relative risk falling within the confidence interval. The width of the confidence interval provides an indication of the precision of the point estimate or relative risk found in the study; the narrower the confidence interval, the greater the confidence in the relative risk estimate found in the study. Where the confidence interval contains a relative risk of 1.0, the results of the study are not statistically significant.

> compounding factors… .  Once this process is completed,
> researchers consider how guidelines for inferring causation
> from an **association** apply to the available evidence.  Their
> guidelines consist of several key inquiries to assist
> researchers in making a judgment about causation…

*Reference Manual on Scientific Evidence* at pgs. 374-375 (emphasis added, footnotes omitted).

These factors are often called the Bradford Hill factors because they were first articulated by Sir.

A. Bradford Hill when he was discussing the evidence linking cigarette smoking and lung

cancer.  A. Bradford Hill, Ltd., *The Environment and Disease:  Association or Causation?*  58

Proc. Royal Soc'y Med. 295 (1965).

Epidemiological studies are to be distinguished from case studies, or case reports or case

series, which are reports in medical journals describing clinical events involving one or a few

individuals.  *Reference Manual on Scientific Evidence*, at p. 474.  Thus, "'[c]ausal attribution

based on case studies must be regarded with caution,' largely because they lack controls and thus

do not provide the level of information or detail found in epidemiological studies."  *Sec'y of

Health and Human Services* v. *Gallagher*, No. 06-670V, 2008 WL 239064, at \*14 (Fed.Cl., June

2, 2008), *quoting Reference Manual on Scientific Evidence*, at p. 475.  Case studies, by

themselves, are insufficient to establish causation.  *Black* v. *Food Lion, Inc.*, 171 F.3d 308, 313

n.2 (5th Cir. 1999).  *Accord*, *Lofton* v. *McNeil Consumer & Specialty Pharmaceuticals*, No.3:05-

CV-1531-L (BH), 2008 WL 4878066, at \*5 (N.D.Tex., July 25, 2008).

---

**statistical significance**.  A term used to describe a study result or difference that exceeds the type I error rate (or p-value) that was selected by the researcher at the outset of the study.  In formal significance testing, a statistically significant result is unlikely to be the result of random sampling error and justifies rejection of the null hypothesis.  Some epidemiologists believe that formal significance testing is inferior to using a confidence interval to express the results of a study.  Statistical significance, which addresses the role of random sampling error in producing the results found in the study, should not be confused with the importance (for public health or public policy) of a research finding.

*Reference Manual on Scientific Evidence* at pp. 387, 389, 394, and 396.

III.      **THE OPINIONS OF DR. CARL F. CRANOR ARE INADMISSIBLE**

A. **The Anticipated Testimony of Dr. Cranor**

Dr. Carl Cranor is a professor of philosophy at University of California Irvine, whom plaintiffs have offered as an expert in philosophy.  *See* Cranor Dep., p. 13. He received his undergraduate Bachelor's degree in Mathematics, his Ph. D. in Philosophy and has a Masters of Law.  *See* Cranor Dep., p. 82.

In his deposition, Dr. Cranor endorsed the use of "non-deductive reasoning" in evaluating scientific evidence, utilizing an "inference to the best explanation", which he admits is "not such a tight relationship between the premises and conclusion."  *See* Cranor Dep., p. 17.  He argues that courts should apply this looser standard when reviewing the admissibility of an expert's opinion regarding a potential causal link between chemical exposure and a disease.  *See* Cranor Dep., p. 17, 114-116.  Dr. Cranor states that Dr. Smith has constructed a well-formed argument, using the non-deductive reasoning or "inference to the best explanation" approach, to reach his conclusions regarding the purported causal link between benzene exposure and APL.  Cranor Dep., p. 82.  For the reasons set forth below, the Court should preclude Dr. Cranor from testifying at the evidentiary hearing scheduled for April 21, 2009 or otherwise give any weight to his testimony.

B. **Dr. Cranor Offers No Scientific Opinions**

Dr. Cranor offers his opinion solely for use at the April 21, 2009 hearing; he will not be testifying to a jury in this case.  *See* Cranor Dep., p. 128.  He provides no scientific evidence to the Court, as he is neither a toxicologist nor an epidemiologist. *See* Cranor Dep., p. 23.  In fact, he does not consider himself a scientist of any sort.  *Id.*  He will offer no opinion with respect to whether or not Dr. Smith is correct in his conclusions. Rather Dr. Cranor intends to opine that

Dr. Smith's opinions are based upon what he considers to be "a well recognized form of argument that has widespread application … with respect to determining an explanation for adverse health effects." *See* Cranor Dep., p. 55.  He assumes that Dr. Smith's reporting of studies is accurate, and he has not reviewed any of the research cited in Dr. Smith's Declaration. He has not looked behind Dr. Smith's opinions to test their validity, nor has he assessed Dr. Smith's methodology.  Furthermore, he has not assessed either the relative weights of the evidence considered or the judgment offered by Smith.  *See* Cranor Dep., at 25, 27, 49, 51, 88, 90, and 95.   In short, Dr. Cranor offers no opinion whatsoever regarding the issue which this Court must analyze and decide in determining whether this case should go to trial – *i.e.*, whether benzene exposure can cause APL.  *See* Cranor Dep., at 82.

Plaintiffs have proffered Dr. Cranor for the proposition that the Court should interpret Rule 702 and *Daubert* in a new and different way.  Dr. Cranor believes that judges should permit scientific experts testifying in tort cases to present the full range of considerations that he claims scientists would rely upon in inferring adverse health effects.  *See* Cranor Dep., at 114.  He is critical of those particular courts that have applied the *Daubert* standards in a way that he views as contrary to how scientists themselves would address scientific issues, contending that some of the judges who have interpreted *Daubert* "really raise[] questions about how well they sort of understand this area of inquiry."  *See* Cranor Dep., at 114-115.  Indeed, Dr. Cranor has even argued that "[c]ourts have also abused the legal device of admissibility rulings to bring cases to a conclusion."  Cranor, *Scientific Ignorance and Reliable Patterns of Evidence in Toxic Tort Causation: Is There a Need for Liability Reform?*, 64 Law and Contemporary Problems, No.4, 10 n.26 (2001). *See* Ex 8 to Cranor Dep.

Under the guise of presenting a philosophy relating to legal standards applicable to expert testimony – rather than offering scientific expertise – Dr. Cranor seeks to opine about the "quality," or scientific reliability and validity, of Dr. Smith's opinion. Although Dr. Cranor provides no scientific evidence of any kind, plaintiffs have proffered him in a vain attempt to buttress their legal assertion that Dr. Smith sets forth a "well formed argument" from a philosophical viewpoint. *See* Cranor Dep., p. 82.  In Dr. Cranor's view, Dr. Smith appropriately reached his conclusions regarding general causation using non-deductive reasoning – if one assumes, as Dr. Cranor did, that Dr. Smith accurately interpreted the data upon which he based his ultimate conclusions.  *See* Cranor Dep., p. 93.  Dr. Cranor's opinions do not serve any relevant or useful purpose and should not be considered by the Court.

### C. Dr. Cranor's Testimony Is Inadmissible Because It Is Not the Proper Subject of Expert Testimony In This Case

The *Daubert* requirements discussed in Part II, s*upra*, apply to all experts, even philosophers.  *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  The final requirement for admissibility of expert testimony under Rule 702 and the *Daubert* progeny is that it assists the trier of fact. *United States v. Frazier*, 387 F.3d 1244, 1262-1263 (11th Cir. 2004).  Under this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the fact finder. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen").  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *United States v. Frazie*r, 387 F.3d 1244, 1262-1263 (11th Cir. 2004).  *See also Lofton* v. *McNeil Consumer & Specialty Pharmaceuticals*, No. 3:05-CV-1531-L (BH), 2008 WL 4878066, at *7 (N.D.Tex., July 25, 2008)("the personal views of [plaintiffs'

experts] as expert testimony supplants the roles of counsel in making argument at trial and the role of the jury in interpreting the evidence[]"), *citing In re Rezullin Prod. Liab. Litig.*, 309 F.Supp.2d 531 (S.D.N.Y. 2004).

Similarly, experts who seek to testify about their interpretation of the law are unhelpful to the Court, which is the exclusive fact finder in this hearing. "Courts generally have held legal opinion testimony inadmissible under Fed. R. Evid. 702." *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 114 (1st Cir. 2003). "This is because the judge's expert knowledge of the law makes any such assistance at best cumulative, and at worst prejudicial." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997) (an expert witness usurps the function of the judge by attempting to interpret legal provisions and offer legal conclusions). Indeed, "**each courtroom comes equipped with a 'legal expert,' called a judge**." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (emphasis added). Dr. Cranor's position that the Court should interpret Rule 702 and the *Daubert* standards more liberally constitutes an "impermissible legal conclusion." *Burkhart*, 112 F.3d at 1213.

As he clearly admitted in the deposition testimony cited above, Dr. Cranor is indifferent to whether the research upon which Dr. Smith reportedly relied is affirmed, defendable or true. Rather, Dr. Cranor contends that, because the non-deductive reasoning or the weight of evidence approach followed by Dr. Smith is utilized by other researchers – whom Dr. Cranor identified as "scientists" whom he personally knows – Dr. Smith's approach is appropriate, without regard to whether Dr. Smith's underlying opinions are valid. *See* Cranor Declaration, at 11, attached as Ex. 1 to Cranor Dep. Dr. Cranor's pronouncements in this regard are nothing more than philosophical musings, and cannot assist the Court in assessing the *Daubert* issue presently before it.

Indeed, given that it is expected that Dr. Smith will similarly testify with respect to the reliability of his methodology, *see* the "weight of evidence" discussion in Plaintiffs' Brief in Support of the Admissibility of Their Expert Evidence on General Causation, pp. 10-13, Dr. Cranor's opinions add nothing new. The fact that some scientists out in the world may, under different circumstances, and for different reasons, use a different philosophical approach to solving the same problem is completely irrelevant to this case and merits no separate consideration. Dr. Cranor's opinions do not assist the Court in evaluating the scientific evidence before it and constitute nothing more than inadmissible argument. Accordingly, the Court should not consider his opinions and should not assign them any value.

**IV.    THE METHODOLOGY OF DR. MARTYN SMITH USED TO FORMULATE HIS OPINION THAT BENZENE CAN CAUSE APL DOES NOT MEET THE STANDARDS FOR ADMISSIBILITY UNDER FEDERAL RULES OF EVIDENCE RULE 702**

Plaintiffs bear the burden of demonstrating that the methodology employed by Dr. Smith meets the requirements for admissibility under Rule 702. *See Daubert*, supra. at 2796 n.10; *Grimes v. Hoffman-LaRoche, Inc.*, 907 F. Supp. 33, 35 (D.N.H. 1995). If they do not carry their burden, then Dr. Smith's opinion that exposure to benzene can cause APL is inadmissible. Moreover, plaintiffs rely exclusively on Dr. Smith's proffered opinion to sustain their showing of general causation regarding benzene exposure and the development of APL. Therefore, because, as his own testimony shows, Dr. Smith's opinion is inadmissible, plaintiffs' case fails.

Dr. Smith's knowledge and experience as a toxicologist studying benzene exposure and its possible effects are not in issue. The challenge is to the "methodology," or lack thereof, that Dr. Smith used in arriving at his opinion that benzene exposure can cause APL. A careful review of Dr. Smith's testimony and report reveals that his opinion regarding benzene exposure and APL is inadmissible. *See* Section II supra at pp 12- 18. Dr. Smith, when questioned about

his method in addressing the scientific question before him, reveals that he abandoned the

scientific method from the outset:

> 22. Q.  When you were approached in this case, what
> 23      were you asked to do?
>
> 24      A.  I was asked to form an opinion as to whether
> 1       or not benzene could cause acute promyelocytic leukemia.
>
> 2. Q.   And what did you go – what did you do to go
> 3       about writing your initial declaration, Exhibit 1?
> 4       MR. JENSEN:  Objection to the form.
>
> 5       THE WITNESS:  Well, initially I said there
> 6       really wasn't a question because there wasn't really a
> 7       doubt that benzene caused acute promyelocytic leukemia,
> 8       in my mind, so I then set about documenting out why that
> 9       was so.  So I pulled the available information on the --
> 10      on that topic and followed a methodology which one could
> 11      take, including the Hill considerations, to formulate an
> 12      opinion as to whether benzene could cause that form of
> 13      acute myeloid leukemia.

(Smith Deposition at pp. 15-16)

### A.  Dr. Smith Admits That There are No Studies Showing a Statistically Significant Association between Benzene Exposure and APL

The *Reference Manual on Scientific Evidence* on pages 374 to 379 in a section entitled

"General Causation: Is an Exposure a Cause of the Disease," sets forth a straightforward

methodology, generally accepted in the scientific community, to determine whether exposure to

an agent causes a particular outcome.  Indeed, the opening sentence of the section succinctly sets

forth the necessary prerequisite to begin the investigation of a potential causal relationship

between the exposure to an agent and whether it causes a particular disease.  "**Once an**

**association has been formed** between exposure to an agent and a disease, researchers consider

whether the association reflects a true cause and effect relationship."  (emphasis added).

According to the Manual, an "association" exists when the relationship between exposure and

outcome occurs more frequently, than it would because of change.  *Reference Manual on Scientific Evidence* at 374.  Dr. Smith agrees that the commonly accepted measures of a statistical association are the p-value and that it must be <.05 or a 95% confidence interval around the odds ratio that does not include the value 1.  *See* Smith Dep. at pp.18-22.

Dr. Smith conceded at his deposition that there are no epidemiological studies that show a statistically significant association between benzene exposure and the development of APL.  *See* Smith Dep., at pp.117-118.  Consequently, this vital and necessary prerequisite, according to the *Reference Manual on Scientific Evidence*, to begin a scientific inquiry into a causal relationship is lacking.  Astonishingly, as noted above, Dr. Smith's "methodology" begins with his conclusion and personal belief that benzene exposures cause APL, and then he begins his search for evidence to support it.

Plaintiffs' brief disingenuously states that Dr. Smith bases his opinion on studies that show a relationship between benzene exposure and APL, *see* Plaintiff's Brief at pp. 16-17, without any mention of Dr. Smith's testimonial concessions that the studies lack statistical significance. *See* Smith Dep. at pp. 117-118.  Plaintiffs also fail to mention that Dr. Smith admitted that certain of these papers do not even explore whether benzene exposure causes APL. *See* Smith Dep. at pp. 81, 89.  In order to try to hide this fatal deficiency,  Plaintiffs try to use a slight of hand about the burden they bear to show Dr. Smith's opinion is admissible.  Plaintiffs must show that there is credible scientific evidence *i.e.*, epidemiological studies showing a statistically significant association upon which Dr. Smith may conclude that benzene exposure can cause APL, in order to have his opinion testimony admitted.  *See* Section II *supra* at pp. 12 – 18.  The fact that the APL may have been observed in a benzene exposed population, *see* Plaintiffs' Brief at 16, is a far cry from a statistical association necessary to show an association.

Further, defendants do not bear any burden in this regard.  They do not need to prove the null

hypothesis that benzene exposure cannot cause APL, which Dr. Smith himself admits is

impossible using scientific methodology.  *See* Smith Dep. at pp. 71-72.

Among the studies that plaintiffs mention is one entitled *Chinese Epidemiologic Study*

*Group of Leukemia and Aplastic Anemia*, Risk Factors Analysis of Leukemia and Aplastic

Anemia in China, <u>Acta Academiae Medicinae Sinicae</u> 14(3):185-189 (1992) [in Chinese with

translation as provided by Dr. Martyn Smith].  *See* Smith Dep. at pp. 100-101, attached hereto as

Exhibit 11 to Smith Dep.  While this study may report a purported odds ratio[20] of 1:42, Dr. Smith

admits that this finding is not statistically significant.  *See* Smith Dep. at p. 101.  Plaintiffs' vain

attempt to compare the odds ratio reported for APL to the statistically significant odds ratio

associating benzene exposure and the M2a subtype of AML does not and cannot impart any

further substance to the lack of statistical significance regarding APL found in this study.

Plaintiffs misrepresent the findings made by Travis et al., in *Hematopoietic Malignancies*

*and Related Disorders Among Benzene-Exposed Workers in China*, <u>Leukemia and Lymphoma</u>

14:91-102 (1994), attached as Ex. 9 to Smith Dep.  Dr. Smith again admits that, while this paper

reports cases of APL among the benzene exposed population, this paper does not calculate odds

---

[20] Two concepts that are often used in epidemiological studies to whether there is an association between an agent and a particular disease are odds ratios and relative risk.  They are slightly different concepts and there calculation depend on the type of epidemiological study being undertaken, a case-control versus a cohort study, respectively.  Again the *Reference Manual on Scientific Evidence* contains useful and understandable explanations of these concepts.  They are as follows:

**odds ratio (OR)**.  Also, cross-product ratio, relative odds.  The ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed.  For most purposes, the odds ratio from a case-control study is quite similar to a risk ratio from a cohort study.

**relative risk (RR)**.  The ratio of the risk of disease or death among people exposed to an agent to the risk among the unexposed.  For instance, if 10% of all people exposed to a chemical develop a disease, compared with 5% of people who are not exposed, the disease occurs twice as frequently among the exposed people.  The relative risk is 10%/5% = 2.  A relative risk of 1 indicates no association between exposure and disease.

*Reference Manual on Scientific Evidence* at pp.392 and 395.

ratios, incidence rates, relative risk or otherwise explore or report a statistically significant association between benzene exposure and APL. *See* Smith Dep., at p. 89. Finally, the study by Mele et al., *Epidemiology of Acute Promyelocytic Leukemia*, Haematologica 80:405-408 (1995), attached as Ex. 4 to Smith Dep., according to Dr. Smith, does not address or document benzene exposure in the study population, but rather studies whether certain occupations or other exposures, such as to lava rock or hair dye, are associated with the development of leukemia. *See* Smith Dep. at pp. 46 – 47. Dr. Smith grudgingly concedes that this paper does not report a statistically significant finding between benzene exposure and APL. *See* Smith Dep. at pp. 47 – 48).

A review of Dr. Smith's Declaration and the papers cited therein and his deposition testimony demonstrates that there are not any studies that report a statistically significant association that exposure to benzene is associated with developing APL. Moreover, at his deposition, Dr. Smith conceded that case reports of APL among the benzene exposed population cannot be the basis of an association between exposure and outcome. *See* Smith Dep. at pp. 30, 105-106. Dr. Smith's own testimony demonstrates that the bases for his opinion on general causation does not meet the initial epidemiological threshold, according to the *Reference manual on Scientific Evidence*, to begin consideration of the factors employed by science to determine a cause relationship.

### B. Dr. Smith's Reliance on "Biological Plausibility" Is Misguided

Without the necessary epidemiology to demonstrate even an association between benzene exposure and APL, Dr. Smith claims he nevertheless employed the Bradford Hill factors, *see Reference Manual on Scientific Evidence* at pp. 374-379, to support his causation conclusion. There are at least nine reported factors to consider, seven of which deal with the epidemiological

association found between the alleged cause and the disease.  (Report of David Garabrant at p. 5, attached hereto as Exhibit 4.)  Recognizing that there is no epidemiologically established association to analyze, Smith instead primarily relies on a single factor "biological plausibility" to establish the relationship between benzene exposure and APL. Setting aside the legal question of whether biological plausibility can, in the absence of epidemiologic proof of an association, be sufficient under *Daubert* (which it is not), Smith simply refuses to consider the evidence which is contrary to his theory of "biological plausibility".     While Plaintiffs and Dr. Smith often try to equate APL to all other AML subtypes, Dr. Smith's Declaration and deposition testimony reveal otherwise.  Dr. Smith agrees that in 95% of APL cases, there is a unique chromosomal translocation called a t(15;17) translocation not found in other AML subtypes. *See* Smith Declaration at p.28; Smith Dep. at p. 18.  He also admits that APL is unique because of the high rate of total cure of APL, with this unique translocation when it is treated with all-transretenoic acid ("ATRA"). *See* Supplemental Declaration of Martyn Smith attached as Ex. 2 to Smith Dep., at pp. 694-695.  Further, Dr. Smith concedes that there are no studies or reports showing an association between the t(15;17) chromosomal translocation in the benzene exposed population. *See* Smith Dep. at pp. 47-48, 89, 101, 117-118.  In fact, Dr. Smith himself has been involved with research efforts over a 12 year period to determine whether benzene exposure can result in the chromosomal translocation unique to APL.  These efforts have failed to show this translocation occurred in the benzene exposed. *See* Smith Dep. at pp. 64-66, 123.  With regard to the benzene exposed population, Dr. Smith recognizes that the subtypes of AML associated with benzene exposure are M1 and M2 that have chromosomal abnormalities at chromosomes 5 and 7 predominantly. *See* Smith Dep. at pp. 55-56.

### C. **Dr. Smith's Syllogistic Reasoning Concerning Biological Plausibility is Flawed.**

Dr. Smith claims that it is biologically plausible that benzene can cause APL.  *See* Smith Declaration, at pp. 36-42.  In essence, Dr. Smith claims that certain benzene metabolites act to inhibit a certain enzyme, topoisomerase II.  *See* Smith Declaration at pp. 36-42; Smith Dep. at p.120.  Because studies have shown an association between certain types of chemotherapy and other therapeutic agents that are topoisomerase II inhibitors and the development of certain subtypes of AML, including the APL subtype, then, according to Dr. Smith, these benzene metabolites can also cause APL. *See* Smith Declaration at pp. 36-42, Smith Dep. at p. 124.  Put another way, Dr. Smith reasons as follows:

Topoisomerase II inhibitors cause AML, including APL.

Benzene or its metabolites are topoisomerase II inhibitors.

Therefore, benzene or its metabolites cause APL.

The flaw is not the formal logic, but the truth value of the premises.  Dr. Smith's premise that topoisomerase inhibitors cause APL includes the hidden assumption that all such inhibitors cause APL.  Dr. Smith acknowledges that certain topoisomerase II inhibitors are not linked to the development of APL, but rather the subtypes M4 and M5.  *See* Smith Dep. at p.32 and Ex 3 to Smith Dep. Dr Smith also conceded that whether benzene or its metabolites are topoisomerase II inhibitors or poisons is also uncertain.  *See* Smith Dep. at pp 60-6). Dr. Smith's syllogistic reason is flawed, fatally in fact, because by his own admission, both of his premises are or may false. Furthermore, David Pyatt, Ph.D., an expert for the defense, reports that there are topoisomerase II inhibitors that are not associated with any form of AML, including APL (Deposition of David Pyatt ("Pyatt Dep.") at pp. 21-22, attached hereto as Ex.5.).

D.  **Dr. Smith's Methodology Fails to Consider and Account for Contradictory Evidence**

While the studies of topoisomerase II inhibiting agents, as opposed to those related to benzene, and AML incidence in human populations, the bases for Dr. Smith's theory of biological plausibility are not the data available about the incidence of AML in the benzene exposed human population, but rather lab tests and studies of benzene metabolites.  *See* Smith Dep. at pp. 52-67.  By his own admission, Dr. Smith allows that these studies about whether the benzene metabolites inhibit topoisomerase II and the mechanism by which they may do so are inconsistent; and that the process by which the purported benzene metabolites cause leukemia is not known or understood.  *See* Smith Dep., at pp. 53-68.  In fact, when Dr. Smith himself, studied the benzene exposed population looking for chromosomal abnormalities seen in conjunction with topoisomerase II inhibitors he did not find them.  *See* Smith Dep. at pp. 61-62. In particular, Dr. Smith's efforts to determine if the unique t(15:17) translocation found in APL cases is present in the benzene exposed population have not confirmed his hypothesis.  *See* Smith Dep. at pp. 67-68.  Finally, Dr. Smith concedes that his theory of biological plausibility that benzene or its metabolites act like a topoisomerase II  inhibitor remains today what it was twelve years ago, at best,  an unproven hypothesis.  *See* Smith Dep. at pp. 125-126.

E.  **The Existing Scientific Evidence Does Not Support Dr. Smith's Theory of Biological Plausibility**

Without any credible scientific support, Dr. Smith, nevertheless, stitches together inadequate population data, an unproven hypothesis about biological plausibility and studies showing benzene exposure at certain exposure levels are associated with particular subtypes of AML that have different types of chromosomal abnormalities than APL, and says this supports his essentially *ipse dixit* opinion that benzene exposure causes APL.  Apparently, according to

Plaintiffs, Dr. Smith's "weight of the evidence" judgment is purportedly sufficient to support the basic requirements of scientific methodology and Rule 702.

The argument that studies regarding specific AML subtypes, in particular APL, and benzene exposure do not exist is belied by those relied upon by Dr. Smith. For instance, the <u>Acta Academiae Medicinae Sinicae</u> study, supra at 25-26, reports a statistically significant association between benzene exposure and the M2 subtype. *See* Smith Dep., at pp.100-103. Similarly, Dr. Smith's own papers report the presence of particular chromosomal abnormalities in the benzene exposed population, but not those associated with APL. Zhang, et al *Aberrations in Chromosomes Associated with Lymphoma and Therapy Related Leukemia in Benzene Exposed Workers,* Environmental and Molecular Mutagenesis 42 (2007), attached as Ex. 6 to Smith Dep.; McHale et al., *Chromosome Translocations in Workers Exposed to Benzene,* J. of Nat'l Cancer Institute Monographs 39 (2008), attached h as Exhibit 7 to Smith Dep. In fact, when Dr. Smith and his colleagues tested for the presence of the APL's unique t (15;17) translocation among the benzene exposed, the findings were without significance. *See* Smith Dep. at p. 67.   Finally, Dr. Smith at his deposition agreed that the M1 and M2 subtypes with chromosomal abnormalities at 5 and 7, and not APL with a translocation at t(15;17), are associated with benzene exposure. *See* Smith Dep. at pp. 31-32, 39.

### F.   The Reports and Testimony of Defendants' Experts Confirm What Dr. Smith Has Conceded.

The reports and testimony of defense experts confirm what Dr. Smith has conceded about flawed methodology. Dr. David Garabrant, in both his report, attached as Ex. 4, and his deposition, *see* Deposition of David Garabrant ("Garabrant Dep.") attached as Ex. 6, pp. 21 -38, underscore that the epidemiological data do not support an association between benzene

exposure and APL.  Moreover, he highlights the number of papers that do report an association

between benzene exposure and certain subtypes of AML.  *See* Garabrant Dep. at pp. 66-68.

      Dr. David Pyatt's report and testimony also confirms what Dr. Smith admits.  The

theoretical biological plausibility claimed by Dr. Smith is hypothetical, see Pyatt Report attached

as Ex. 3; Pyatt Dep., at pp. 31 – 35, and studies and investigations reveal evidence that conflicts

with Smith's hypothesis.  *See* Pyatt Dep. at pp. 45-47.  The facile and incomplete explanation

about stem cells origins of AML described in Dr. Smith's report, *see* Smith Declaration at p. 36,

according to Pyatt fails to consider or to account for contradicting evidence.  *See* Pyatt Dep., at

pp. 31-35, 67-68; Pyatt Report at ¶ 19.  Moreover, as Dr. Pyatt explains, the evidence that

benzene metabolites act as topoisomerase II inhibitors capable of causing the t(15;17)

translocation unique to APL is uncertain at best, in light of conflicting *in vitro* evidence.  See

Pyatt Report at ¶ 18.  He also notes that simply because an agent inhibits topoisomerase II does

not mean it can cause leukemia because there are known topoisomerase II inhibitors that are not

associated with APL or any other form of leukemia.  *See* Pyatt Dep. at pp. 21, 47.  Dr. Smith's

methodology which was not more than a quest for evidence to support his conclusion, fails to

consider or to account for any this data and information noted by Dr. Pyatt.

      Similarly, Dr. John Bennett's report and testimony make clear that the pathogenesis of

AML and APL in particular remain unclear.  *See* Report of John Bennett, MD ("Bennett

Report") generally, attached as Exhibit 7, Transcript of Deposition of John Bennett (Bennett

Dep."), at pp. 18-19, 42-43, attached as Ex. 8,, and that the statement that benzene metabolites

acting as topoisomerase II inhibitors, or otherwise, can cause APL is without scientific basis. *See*

Bennett Report at p.4; Bennett Dep. at pp. 10-16.

G. **Dr. Smith's Conclusion Is Based Upon the Formal Logical Fallacy of the "Undistributed Middle."**

As many courts, including this Court, have noted, the linchpin and starting point to determine whether exposure to an agent causes a particular condition are epidemiological studies showing an association between exposure and outcome.  The epidemiological evidence necessary to support Dr. Smith is not available.

In his Supplemental Declaration, Dr. Smith, seeking to avoid the inevitable conclusion that results from the lack of epidemiological data, engages in the classical logical fallacy of the "Undistributed Middle."  While he offers the excuse of limited data pertaining to benzene exposure and any association with APL for having to do so; Dr. Smith concludes that because benzene exposure can cause certain forms of AML, and because APL is a subtype of AML, then benzene exposure can cause APL. *See* Smith Dep., Ex. 2 at pp. 694 -698. This fallacy "occurs whenever it is argued that because x and y belong to the same class or possess a common property, they are identical."  Aldisert, R.J. *Logic for Lawyers: A Guide to Clear Legal Thinking*, CBC, 1992, at pp. 10-9.  Some examples are useful to explain this fallacy.

All canaries are birds

All hawks are birds

Therefore, all canaries are hawks.

Notwithstanding the puffery of "weight of the evidence" or "best explanation" terminology, Dr. Smith's conclusion, reached before he searched for or examined the evidence, reduce to a timeworn syllogistic trick, a logical fallacy that cannot masquerade as scientific methodology.  Further, when subject to scrutiny, Dr. Smith's conclusion, formed upon initial inquiry, is nothing more than an *ipse dixit* pronouncement based upon his status rather than

rigorous science.  According to *Daubert*, this does not meet the requirements under Rule 702 for the admission of expert opinion testimony.

## <u>CONCLUSION</u>

In order to have the expert opinion testimony of Dr. Smith admitted plaintiffs must show that the methodology he used to reach his conclusions satisfy the requirements of Fed. R. Evid. 702 and interpreted by *Daubert* and its progeny including the decisions of the First Circuit and this Court.  As shown above, Dr. Smith did not engage in any rigorous scientific examination of the evidence before he arrived at his conclusion.  When he subsequently searched for evidence to support his conclusion, none is an epidemiological study showing an association between benzene exposure and APL, the *sine qua non* of showing an association and possibly a causal connection.  On this basis alone, the Court should exercise its gatekeeper function under Daubert and exclude the opinion of testimony of Dr. Smith that benzene can cause APL.  A further examination of Dr. Smith's methodology reveals that among the other 9 or so factors examined by scientists exploring a cause and effect relationship, he conveniently ignores those which rely on epidemiologically established association and primarily relies on one – biological plausibility. Even in that area, Dr. Smith does not in any methodological manner consider and account for the data and information that call into question his hypothesis.  Nothing Dr. Smith did even approximates the methodology set out in the *Reference Manual on Scientific Evidence* and required by Federal Rules of Evidence, Rule 702.  Contrary to plaintiffs' arguments, this is not a difference of opinion between experts about the ultimate question, but rather a failure on the part of plaintiffs' experts to engage in a rigorous methodology to arrive at his conclusion.

Respectfully submitted,

The Defendants,

By Their Attorneys,

**Defendants:**

**Acuity Specialty Products**
**Defendant**
By Its Attorneys,

/s/ W. Joseph Flanagan

_____

W. Joseph Flanagan
Curtis L.S. Carpenter
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210
617-439-7589

**Aristech Chemical Corporation,**
**United States Steel Corporation**
**and USX Corporation**
**Defendants**
By Their Attorneys,

/s/ Raymond H. Tomlinson, Jr.

_____

Raymond H. Tomlinson, Jr.
Melick, Porter & Shea, LLP
28 State Street
Boston, MA 02109
617-523-6200

and

/s/ Tim Gray

_____

Tim Gray
Forman, Perry, Watkins, Krutz & Tardy
200 South Lamar Street, Suite 100
Jackson, MS 39201-4099
601-960-8600

**American Grease Stick Company**
**Defendant**
By Its Attorneys,

/s/ Syd A. Saloman

_____

Syd A. Saloman
Tucker, Heifetz & Saltzman, LLP
100 Franklin Street
Boston, MA 02110
617-557-9696

**Berryman Products, Inc.**
**Defendant**
By Its Attorneys,

/s/ Brian P. Voke

_____

Brian P. Voke
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston, MA 02129
617-241-3052

**Boyle-Midway, Inc.**
**Defendant**
By Its Attorneys,

/s/ Mark B. Lavoie
_____

Mark B. Lavoie
McDough, Hacking & Lavoie, LLC
One Washington Mall
Boston, MA 02108
617-367-0808

**CRC Industries, Inc.**
**Defendant**
By Its Attorneys,

/s/ Joseph J. Leghorn
_____

Joseph J. Leghorn
(BBO # 292440)
Nancy C. Antonellis
(BBO # 669974)
Nixon Peabody, LLP
100 Summer Street
Boston, MA 02110-2131
617-345-1114

**The Clorox Company**
**Defendant**
By Its Attorneys,

/s/ Charles K. Mone
_____

Charles K. Mone
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston, MA 02129
617-241-3052

**Henkel Corporation**
**Defendant**
By Its Attorneys,

/s/ Lawrence G. Cetrulo
_____

Lawrence G. Cetrulo
(BBO # 080000)
Christopher M. Tauro
(BBO # 565086)
Kevin R. Powers
(BBO # 644635)
Cetrulo & Capone, LLP
Two Seaport Lane, 10th Floor
Boston, MA 02210
617-217-5210

and

/s/ Michael F. Brown
_____

Michael F. Brown (pro hac vice)
Michael P. Ertle (pro hac vice)
Drinker Biddle & Reath, LLP
One Logan Square (18th & Cherry Streets)
Philadelphia, PA 19103-6996
215-988-2700

**Nicus Corporation**
**Defendant**
By Its Attorneys,

/s/ Ralph Perry-Miller

_____

Ralph Perry-Miller
Looper, Reed & McGraw, P.C.
1601 Elm Street, Suite 4100
Dallas, Texas 75201
214-954-4135

and

/s/ Maynard M. Kirpalani

_____

Maynard M. Kirpalani
Wilson, Elser, Moskowitz, Edelman &
Dicker, LLP
260 Franklin Street
Boston, MA 02110-3112
617-422-5300


**Radiator Specialty Company**
**Defendant**
By Its Attorneys,

/s/ Brian R. Birke

_____

Brian R. Birke
Adler, Pollock & Sheehan, P.C.
175 Federal Street
Boston, MA 02110
617-482-0600

**NCH Corporation (Chemsearch Div.)**
**Defendant**
By Its Attorneys

/s/ Wes Weathers

_____

Wes Weathers
Weathers, Riley & Sheppeard
4848 SW 21st Street, Suite 202
Topeka, KS 66604
785-273-2020

and

/s/ Marianne E. Brown

_____

Marianne E. Brown
Governo Law Firm, LLC
260 Franklin Street, 15th Floor
Boston, MA 02110
617-737-9217


**Nu-Calgon Wholesaler, Inc.**
**Defendant**
By Its Attorneys,

/s/ Sandra J. Wunderlich

_____

Sandra J. Wunderlich
Stinson Morrison Hecker, LLP
100 South Fourth Street, Suite 700
St. Louis, MO 63102
314-259-4560

and

/s/ Peter C. Kober

_____

Peter C. Kober
Litchfield Cavo, LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940
781-309-1500

**The Sherwin-Williams Company**
**Defendant**
By Its Attorneys,

/s/ Lawrence G. Cetrulo

_____

Lawrence G. Cetrulo
(BBO # 080000)
Christopher M. Tauro
(BBO # 565086)
Kevin R. Powers
(BBO # 644635)
Jeffrey D. Adams
(BBO #662697)
Cetrulo & Capone, LLP
Two Seaport Lane, 10th Floor
Boston, MA 02210
617-217-5210

and

/s/ James R. Miller

_____

James R. Miller (pro hac vice)
Christopher D. Stofko (pro hac vice)
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222
412-392-5280

**Rust-Oleum Corporation**
**Defendant**
By Its Attorneys,

/s/ Francis M. Lynch

_____

Francis M. Lynch
Keegan Werlin, LLP
265 Franklin Street
Boston, MA 02110
617-951-1400

**The Steco Corporation**
**Defendant**
By Its Attorneys,

/s/ Christopher J. Sullivan

_____

Christopher J. Sullivan
Sullivan & Collins
500 W. Cummings Park, Suite 400
Woborn, MA 01801
781-939-5840

and

/s/ W. Joseph Flanagan

_____

W. Joseph Flanagan
Curtis L.S. Carpenter
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210
617-439-7589

**Sunnyside Corporation**
**Defendant**
By Its Attorneys,

/s/ Thomas J. Tobin

_____

Thomas J. Tobin
Leslie A. Sheehan
Gordon & Rees, LLP
101 W. Broadway, Suite 200
San Diego, CA 92101
619-696-6700

Dated:  March 30, 2009

**WD-40 Corporation**
**Defendant**
By Its Attorney

/s/ Christopher G. Betke

_____

Christopher G. Betke
Ryan, Coughlin & Betke, LLP
175 Federal Street
Boston, MA 02110
617-988-8047

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 30, 2009, I caused to be served a copy of the foregoing to all counsel of record via the Court's ECF System.

/s/ Joseph J. Leghorn

_____

Joseph J. Leghorn